**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Ricky A. SALYERS, Defendant–Appellant.**

No. 97–2735.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 24, 1998.

Decided Nov. 20, 1998.

**1154**

Lawrence S. Beaumont (argued), Office of the United States Attorney, Urbana, IL, for Plaintiff–Appellee.

William E. Herzog (argued), Kankakee, IL, for Defendant–Appellant.

Before COFFEY, MANION and ROVNER, Circuit Judges.

COFFEY, Circuit Judge.

Defendant–Appellant was indicted and charged with six counts of possessing destructive devices in violation of 26 U.S.C. §§ 5861(d) and 5871, and one count of improperly storing explosive materials in contravention of 18 U.S.C. §§ 842(j) and 844(b). He originally pled not guilty to all counts, but after the district court denied his motion to suppress evidence, he entered into a conditional plea agreement whereby he pled guilty to one count of possession of a destructive device, while reserving his right to appeal the court's denial of his motion to suppress. In return, the government promised to dismiss the other counts on the condition that the sentencing judge could consider information from the charges as "relevant factors" at sentencing. Salyers was sentenced by Judge Harold A. Baker, United States District Court for the Central District of Illinois, to 41 months in prison. Salyers now challenges the trial court's denial of his motion to suppress evidence, factual findings made by the court dealing with the length of his sentence, and the court's interpretation of the United States Sentencing Guidelines. We affirm.

## I. BACKGROUND

From 1979 to 1995, Ricky A. Salyers was an active member of the U.S. Marine Corps ("Corps") and while in service he maintained an exemplary record instructing other Marines in demolition, sniper training, breaching, and the use and care of firearms. Over the years, for reasons unexplained in the record, Salyers saw fit to collect and stash away an array of firearms, ammunition, and dangerous explosive materials, thereby forming his own personal arsenal. Salyers gained possession of the majority of these weapons while in the Corps without the knowledge or consent of his superior officers. Sometime in 1993, Salyers transported at least a part of his stash of dangerous weapons and materials in a Ryder truck from his home in Virginia to Illinois. Salyers left the items at his father's farm in Iroquois County, Illinois, and shortly thereafter, returned to the south and took up residence in North Carolina. In December, 1995, while still on active status in the Corps, Salyers was convicted in North Carolina state court of two misdemeanor counts of Assault on a Government Official. The conviction stemmed from an incident in which Salyers tossed a live grenade (with the pin still in) in the vicinity of state law enforcement officers who were in the backyard of his place of residence to serve a state search warrant. Salyers pled guilty to the assault charge, and on January 16, 1996, was sentenced to 45 days imprisonment and eighteen months probation. As a condition of his probation, Salyers was ordered not to possess explosives, firearms, or other dangerous weapons of any type. Following his conviction, on July 12, 1996, Salyers was given a General Under Honorable Conditions discharge from the United States Marine Corps.

In January, 1997, after serving his term of imprisonment but while still on probation, Salyers returned to his father's farmhouse in Illinois planning to live there with his father and search for employment. Ricky's half-brother, Gary Salyer, also lived in the family farmhouse while another brother, Rusty Salyer, lived nearby.[1] Half-brother Gary is a convicted felon who in 1997 was also on probation, and like Ricky, under court order was not permitted to possess weapons. Not to be outdone, Ricky's other brother, Rusty Salyer, also had been in trouble with the law as evidenced by his three prior burglary convictions.

According to the record, sometime in mid-January, 1997, Gary telephoned the Iroquois County Sheriff's Office and accused his half-

---

1. Ricky Salyers' last name is "Salyers." His brothers' last name is "Salyer." According to the record, Ricky is called "Salyers" due to a mistake on his birth certificate.

brother Rusty of committing another burglary. On January 21, 1997, Chief Detective Randy Eiman summoned Rusty to the Iroquois County Sheriff's Office and questioned him about the reported burglary. Apparently in retaliation, Rusty informed Detective Eiman that within the past few weeks, he had an opportunity to observe a number of dangerous weapons in the farmhouse where Gary and Ricky lived with their father, including mini-fourteen rifles and a sawed-off shotgun. Rusty suggested to Detective Eiman that Gary be arrested for possessing weapons in violation of the terms of his probation. Rusty also told Eiman that he had observed a "rocket launcher" stored in a Wells Cargo trailer parked outside the farmhouse. The trailer was owned by the defendant-appellant Ricky Salyers.

Detective Eiman was aware of the fact that Rusty Salyer had previously been convicted for burglary. Eiman was also aware of the fact that Rusty had provided reliable information to law enforcement officers in past criminal investigations. Detective Eiman decided to investigate Rusty's allegations, and on January 21, 1997, based upon his discussion with Rusty, Eiman applied for and received a search warrant to search the farmhouse and the nearby trailer. Rusty provided a statement to both the state's attorney and the state judge, and signed an affidavit which stated that in the past two or three months he had observed: (1) a modified shotgun with a shortened barrel stored in a red metal gun safe in a bedroom of the farmhouse; and (2) "an object in a green crate with United States military markings upon it, shown ... and described to him by Rick Salyer (sic) as a hand-held missile or rocket launcher capable of destroying a vehicle." In light of the contents of Rusty's affidavit, the state judge found probable cause and issued the warrant at 1:10 p.m. that same day. The warrant authorized search of the farmhouse as well as a "black cargo trailer marked Wells Cargo" located in the nearby vicinity of the farmhouse.

Detective Eiman and another officer, deputy Mike Coleman, arrived at the farmhouse with the warrant in hand at approximately 3:30 p.m. that same day, January 21, 1997, and observed Ricky Salyers, Gary Salyer, and their father in the garage working on a

car. According to Ricky, the officers approached them and "said they wanted us to go into the house and that they had something they wanted to talk to us about, and when we got in they had us sit down at the kitchen table." The officers followed them into the kitchen, and informed them that Rusty had signed a complaint, and that the officers had a search warrant authorizing them to search their home and the trailer for firearms and the other items described in the warrant. Detective Eiman displayed the search warrant and allowed the men to read it, and also gave a copy of the warrant to Ricky. During the time period referred to, the men were never handcuffed nor was there any physical contact. The officers neither drew nor displayed their weapons at any time, nor did they block the door or any of the other exits. Ricky admits that he neither asked to leave, nor made any attempt to leave, during this encounter. Moreover, the relevant conversation took place at the kitchen table located in the farmhouse where Ricky lived. Later, at Ricky's suppression hearing, he challenged the admissibility of the statements made during this encounter and a later conversation, and testified he "didn't feel" he could leave the kitchen table, but agreed that "there was nothing physically done by the officers to corroborate [his] feeling that [he] should stay there at the table."

Following the reading, explanation and discussion of the search warrant, and Ricky's review of the warrant, the officers proceeded to search the farmhouse and came upon a red, locked combination safe in the father's bedroom, which the father unlocked at Eiman's request. Inside, officers found a number of guns owned by Ricky Salyers and his father, including a Ruger mini-fourteen assault rifle which Ricky admitted was his. Ricky also stated that during the search, he took "a tape measure and helped measure the shotguns" with the officers.

Following the search of the farmhouse, while Deputy Coleman remained inside the farmhouse with Gary Salyer and his father, Eiman and Ricky walked to the Wells Cargo trailer located some 75 yards from the farmhouse. The trailer contained a number of

crates and boxes. Ricky unlocked the trailer and led Eiman inside where Ricky proceeded to describe the contents of each, including approximately five pounds of C–4 plastic explosives. At the suppression hearing, Ricky was asked if he was free to leave while inside the trailer. Rather than providing a direct response, Ricky unresponsively stated that "[Eiman] was pretty much up my rear on that." Eiman, on the other hand, made clear that during their walk to the trailer, and while inside the trailer and during the examination thereof, Eiman did not restrict Ricky's movement in any manner whatsoever.

Because Detective Eiman is not an explosives expert, he decided to contact personnel from the United States Army's explosive ordinance disposal unit ("EOD") at Fort Leonard Wood, in Missouri, before continuing his inspection of the contents of the trailer. During this conversation with EOD personnel, Detective Eiman apparently attempted to glean information concerning the types of weaponry located in and about the trailer and to determine whether they were dangerous, but according to Ricky, Eiman "didn't know what he was talking about." Without prompting, and on his own, Ricky "volunteered" to explain the contents of the trailer to the Fort Leonard Wood EOD sergeant. During the phone conversation, Ricky joined in and described the weapons in the trailer, including telling the EOD sergeant that C–4 explosives were also stored there.

After speaking with the EOD sergeant, Detective Eiman decided to forego the trailer inspection until such time as explosives specialists could arrive at the farmhouse to assist in the search. We note that at Ricky's suppression hearing wherein he explained the day's events, Ricky specifically testified that he, Gary, and their father were told by an officer "to stay at the kitchen table so [they] could be observed." The district court apparently did not find this testimony particularly compelling. In fact, the statement is seemingly inconsistent with Ricky's other testimony where he described himself as helping the officers measure the guns, walking to the trailer and discussing its contents, and speaking with the EOD personnel on the telephone. Moreover, according to Ricky's further admissions, before Eiman left the farmhouse, he told Ricky and his family

members that they were "free to do whatever we wanted to do, and they'd be back sometime around noon the next day." After telling Ricky he was free to come and go as he wished, Detective Eiman departed, and Deputy Coleman kept the trailer under surveillance throughout the night.

The following morning, January 22, 1997, in response to Detective Eiman's statement that Ricky was free to leave the farmhouse, Ricky decided to take the suggestion to heart and drove to the sheriff's station to secure another copy of the search warrant because he had misplaced the first copy. At approximately 4:15 that afternoon, after Salyers had returned to the farmhouse, Detective Eiman, another officer, and three special agents from the Bureau of Alcohol, Tobacco and Firearms ("ATF") arrived on the scene. Once again, Ricky was found working on an automobile outside the residence. Two of the ATF representatives, including special agent Cynthia Beebe, asked Ricky to accompany them to their vehicle and, after he accepted the invitation to sit inside the car because it was cold at that time, the agents asked Ricky to describe the contents of the trailer. Ricky testified that during this discussion, there was never physical contact of any kind, the car doors were unlocked, and nobody told him he could not leave. Over the course of the conversation, Ricky informed the agents that the trailer did not contain booby traps or any other items that could cause immediate or accidental harm during a search. ATF officers inspected the trailer, and seized four 1¼ pound sticks of C–4 explosives, four training grenades, detonating cord, and flex-x explosive.

Later that evening, Ricky, Agent Beebe, and one of the local officers sat together at the kitchen table and talked while the rest of the family sat in the living room watching television. The record does not reveal all of the topics discussed, much less the entire contents of their conversation, though Ricky states he was asked some questions about how he acquired the weapons. Ricky testified that inasmuch as the conversation was "going nowhere," he told Beebe he would "rather speak to my lawyer" at that juncture of the investigation. In response, at this time Agent Beebe read Ricky his Miranda

rights. Immediately thereafter, Detective Eiman arrested Ricky and drove him to jail at about 8:30 that evening.

Also that day, prior to any search or conversation with Ricky, Agent Beebe applied for and received a search warrant to search the entire five-acre residence and the surrounding area, including "all grounds and vehicles or structures adjacent thereto," in part so she could search for any possible buried or hidden weapons.[2] Specifically, the warrant permitted search of the farmhouse, the surrounding five-acre plot, and the trailer, and authorized the seizure of "(1) any bomb, grenade, artillery projectile or other explosive substance or device or items which may be components or used to construct such devices or items similar thereto; (2) any firearms or firearms ammunition; (3) any property of a type issued by the United States military which would not be sold or distributed outside the military."

The following day, January 23, 1997, ATF agents arrived at the farmhouse, and pursuant to Agent Beebe's warrant and command, began their search of the five-acre plot. They failed to locate any buried or hidden weapons, but during the inspection of the Wells Cargo trailer, they discovered and seized a large amount of ammunition, including .50 caliber cartridges with phosphorous tips and .50 caliber tracer cartridges. Officers also seized, among other things, five Mark 141 Mod O diversionary devices ("MK 141s"), a Claymore mine, detonators, blasting caps, and assorted firearms. Officers did not find a rocket launcher or any similar device. It is undisputed that the defendant had neither a license nor a permit from the National Licensing Center to possess any of the firearms seized in the farmhouse or in the trailer.[3]

On February 19, 1997, Salyers was indicted and charged with six counts of possessing destructive devices in violation of 26 U.S.C. §§ 5861(d) and 5871, and one count of improperly storing explosive materials in violation of 18 U.S.C. §§ 842(j) and 844(b). Specifically, the indictment charged Salyers with five separate counts of possessing destructive devices described as MK 141s (one count for each MK 141 possessed), one count of possessing a Claymore mine, C–4 explosive, and blasting caps (which, in proximity, constitute an active mine), and one count of storing these explosive materials too close to an inhabited building. Salyers pled not guilty to all counts. On April 10, 1997, Salyers filed a motion to suppress the evidence and any and all statements he made prior to receiving his *Miranda* warning, and to suppress evidence seized pursuant to Detective Eiman's search warrant alleging that the warrant was issued and the evidence was seized based upon false statements by Eiman contained in the warrant application. The district court conducted a hearing on the motion to suppress and found that Salyers was not in custody for purposes of *Miranda* at any time prior to being read his *Miranda* rights, and furthermore, that Eiman did not knowingly make false statements to procure the warrant. Accordingly, the district judge denied the motion to suppress.

On April 11, 1997, Ricky entered into a conditional plea agreement with federal prosecutors, reserving the right to challenge the court's denial of his motion to suppress. He pled guilty to possession of a destructive device (count six—the active mine) in return for the government's promise to drop all other counts and to recommend a sentence on the low end of the appropriate sentencing range.[4] On July 3, 1997, the district court held a Final Disposition Hearing. After hearing testimony from ATF Agent David Shatzner (a destructive devices expert) and

---

**2.** Agent Beebe testified at the suppression hearing that she was wary of buried weapons or booby traps because she had spoken with an NIS agent who described Ricky Salyers as a "highly trained marine in demolitions, snipers breecher (sic), and firearms" who had "been trained to hide and bury weapons and explosives to be able to use them at a later date."

**3.** 26 U.S.C. § 5841(d) makes it unlawful for any person to receive or possess a firearm which is not registered to that person in the National Firearms Registration and Transfer Record.

**4.** Of course, pursuant to § 1B1.3 of the U.S.S.G., the trial judge is required to consider "relevant conduct," including conduct not formally charged, in calculating the base offense level. *See United States v. Garcia,* 66 F.3d 851, 859 (7th Cir.1995).

defendant Ricky Salyers, the court determined his offense level to be 21.[5] The court determined Salyers' criminal history category to be two, inasmuch as he had three criminal history points.[6] The judge noted that the guidelines for the relevant offense level and criminal history category provided a range of 41 to 51 months imprisonment, and sentenced Salyers to 41 months in prison to be followed by three years of supervised release. The court entered its final judgment on July 7, 1997. Salyers appealed. We affirm.

## II. ISSUES

(1) Whether the trial judge "clearly erred" when he denied Ricky Salyers' motion to suppress; (2) whether the district court "clearly erred" when it found that the MK 141s seized from the trailer qualify as "destructive devices" for purposes of § 2K2.1(b)(3) of the U.S.S.G.; and (3) whether it was proper for the district judge to add two criminal history points under U.S.S.G. § 4A1.1(d) for committing the instant offense while on probation for an earlier offense (North Carolina assault conviction), and also adding one point under U.S.S.G. § 4A1.1(c) for having actually committed the North Carolina assault offense.

## III. DISCUSSION

A. *Whether the Trial Court Erred when it Denied Ricky Salyers' Motion to Suppress.*

■ Defendant Salyers alleges that the trial court erred by denying his motion to suppress in which he sought exclusion of (1) statements he made to investigators prior to being advised of his *Miranda* rights under the Fifth and Sixth Amendments (*see Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)); and (2) evidence seized pursuant to a search warrant that Salyers claims contained information known to be false by the detective who applied for and received the warrant. In denying Ricky's motion to suppress, the experienced trial judge found that Ricky was free to leave, and not in the custody of the officers, at any time prior to receiving a *Miranda* warning. Also upon review, the judge found that detective Eiman did not knowingly provide false information to obtain the search warrant for the farmhouse. We review the trial court's findings on the suppression of evidence question under a "clearly erroneous" standard. *See United States v. Duguay*, 93 F.3d 346, 349 (7th Cir.1996). A finding of fact is clearly erroneous if, after a comprehensive review of the evidence, we are left with "the definite and firm conviction that a mistake has been made." *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir.1994).

1. Did the Trial Court Incorrectly Find that Ricky Salyers was not in Custody at any Time Prior to Receiving a *Miranda* Warning?

■ Initially, defendant Ricky Salyers argues that the trial court improperly denied Salyers' motion to suppress statements he made to investigators on January 21 and 22, 1997. Specifically, Salyers alleges that two conversations should have been excluded from being used as evidence against him: (1) his January 21 conversation with detective Eiman at the kitchen table, and (2) his January 22 conversation with Agent Beebe, again at the kitchen table. Salyers alleges that on each of these occasions he was subjected to a "custodial interrogation" by the law enforcement officers prior to being arrested and advised of his *Miranda* rights at 8:30 p.m. on January 22, 1997. The government argues, and the district court found, that Ricky was not in custody until the time of his arrest at 8:30 p.m. on January 22, 1997, and thus officers were not required to give the *Mi-*

---

**5.** The court determined offense level 21 based on the following: base offense level 18 for possession of a prohibited firearm (*see* U.S.S.G. § 2K2.1(a)(5)); increase for specific offense characteristics including two levels for possession of five to seven prohibited firearms (or destructive devices) (*see* U.S.S.G. § 2K2.1(b)(1)), two levels for possession of destructive devices (*see* U.S.S.G. § 2K2.1(b)(3)), two levels for possession of . stolen firearms (*see* U.S.S.G. § 2K2.1(b)(5)); and decrease of three levels for acceptance of responsibility (*see* U.S.S.G. § 3E1.1(a) and (b)(2)).

**6.** Salyers' criminal history determination was based on one point for a prior assault conviction (*see* U.S.S.G. § 4A1.1(c)) and two more points for commission of the instant crime while on probation (*see* U.S.S.G. § 4A1.1(d)).

*randa* warning prior to that time. We review *de novo* the district court's determination that a "custodial interrogation" did not occur prior to the time that Ricky was placed under arrest. *See United States v. James,* 113 F.3d 721, 727 (7th Cir.1997); *United States v. Yusuff,* 96 F.3d 982, 988 (7th Cir. 1996). Any "historical" facts and credibility determinations are reviewed deferentially under the clear error standard. *See id.*

■ It is well-established that Fifth and Sixth Amendment warnings are required only during a "custodial interrogation." *See Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). The Supreme Court has defined a "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda,* 384 U.S. at 467, 86 S.Ct. 1602. Thus, a suspect must be both in custody and subject to interrogation to trigger the *Miranda* warnings requirement. *See Yusuff,* 96 F.3d at 987; *United States v. Burns,* 37 F.3d 276, 280 (7th Cir.1994). Because we agree with the trial court's finding that Salyers was not in custody until that time when he was read his *Miranda* rights, the question of any interrogation prior to that time does not arise. *See United States v. Shlater,* 85 F.3d 1251, 1256 (7th Cir.1996) (custody is a prerequisite for determining whether an interrogation occurred).

■ An individual is considered "in custody" when his freedom of movement is restrained to the degree comparable to a formal arrest. *See California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983); *Yusuff,* 96 F.3d at 987. Custody "implies a situation in which the suspect knows he is speaking with a government agent and does not feel free to end the conversation; the essential element of a custodial interrogation is coercion." *United States v. Martin,* 63 F.3d 1422, 1429 (7th Cir.1995). An individual is not in custody if a reasonable person would have believed he was free to leave, and the test is an objective one. *See United States v. Boden,* 854 F.2d 983, 991 (7th Cir.1988).

■ Before examining the factual circumstances concerning Ricky's allegations that he was in custody, we address his specific and unique argument that we examine his military experience, wherein he "was trained to obey orders from those in authority," as a factor in analyzing whether or not Ricky believed he was free to leave during the "kitchen table" conversations. In essence, Salyers requests that we apply a subjective test. This we decline to do. The test is not whether the particular defendant thought he was free to go, but whether a "reasonable person" in the circumstances would have believed so. *See Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988); *United States v. Lennick,* 917 F.2d 974, 977 (7th Cir.1990); *Boden,* 854 F.2d at 991; *see also Stansbury v. California,* 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) ("the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by ... the person being questioned"); *Berkemer v. McCarty,* 468 U.S. 420, 422, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) ("the only relevant inquiry is how a reasonable man in the suspect's shoes would have understood his situation"). As such, we will not consider Ricky's alleged inclination to blindly obey authority figures to determine whether he was free to leave.

When reviewing a district court's determination regarding the question of whether a suspect was in custody, this court has repeatedly directed that the trial judge make a specific finding as to "freedom to leave" in the Fourth Amendment context. *See, e.g., Boden,* 854 F.2d at 991; *United States v. Pavelski,* 789 F.2d 485, 489 n. 2 (7th Cir. 1986); *United States v. Borys,* 766 F.2d 304, 310 (7th Cir.1985); *United States v. Notorianni,* 729 F.2d 520, 523 (7th Cir.1984). Here, Judge Baker assisted the appeal process and followed this court's previous mandates with an explicit finding that Ricky was not in custody and was free to leave until such time as Agent Beebe read him his *Miranda* warnings. In his April 11, 1997, Order on Defendant's Amended Motion to Suppress, the judge made a detailed finding that "at no time prior to the time Eiman arrested [Salyers] was he told he couldn't leave, nor did he ask to leave, or attempt to leave. I find there was no custodial interrogation of

[Salyers] prior to the time Eiman placed him under arrest and Beebe read him his rights. Up until that time [Salyers] was free to leave." We are in agreement with the trial court's finding.

Salyers' argument is that he was in custody on January 21 and again on January 22, 1997, before he was apprised of his *Miranda* rights. At the suppression hearing, the judge received testimony from Detective Eiman, Agent Beebe, Rusty Salyer and Ricky Salyers. Ricky testified that during the January 21, 1997 discussion in the kitchen, "there was nothing physically done by the officers to corroborate [his] feeling that [he] should stay at the table," and furthermore, no one was arrested at that time, nor was anyone told that they could not leave, nor were they placed in any type of restraint. Neither Eiman nor any other officer drew or displayed their weapons, nor did they make any other show of force or authority. Significantly, Ricky admits he "volunteered" to speak to the EOD sergeant on the telephone and informed him of the presence of C–4 explosives. As another example of Ricky's freedom of movement and overall state of mind, he testified that he *assisted* the officers in measuring guns found inside the farmhouse. Ricky also testified that at the end of the first day, after a search of the farmhouse, Detective Eiman told the defendant that he and his family were "free to do whatever we wanted to do, and they'd be back sometime around noon the next day." Relying on Detective Eiman's statement, Ricky decided to drive to the sheriff's station the morning of January 22 to acquire another copy of the search warrant, and even acknowledged at the suppression hearing that he fully believed he was free to leave on the evening of January 21.

Now dealing with January 22, 1997, Salyers was read his *Miranda* rights at 8:30 p.m., but he objected to the admissibility of statements he made during a kitchen table discussion with Agent Beebe prior to the *Miranda* reading. At no time did Ricky attempt to leave the table, nor was he restrained or coerced in any manner from leaving the table, and nobody interfered with his right to exit. Furthermore, he was neither handcuffed nor physically restrained in any manner. Agent Beebe neither drew nor displayed her weapon to Ricky as they sat at Ricky's kitchen table. In fact, Agent Beebe testified very explicitly, in response to a question, that Ricky was not in custody at that time. Ricky has failed to point to any statements made or any other evidence in the record that would lead one to the conclusion that he was not free to leave the table. The record indicates only that Ricky felt the conversation was "going nowhere" and stated to Agent Beebe that he would "rather speak to my lawyer," at which time Beebe read him his rights.

Moreover, Ricky has failed to state, much less point us to, any of the allegedly inadmissible statements made during the conversation with Agent Beebe. The record demonstrates that Ricky had previously provided all the information referred to herein that he now seems to argue is inadmissible, and furthermore, it is clear that he voluntarily assisted Detective Eiman and local enforcement officers during their inspection and search, including assisting the officers in measuring the guns in the farmhouse, and leading Eiman to the trailer, opening the door, and describing the trailer's contents. He also volunteered to discuss the characteristics of his various weapons when he spoke with the Fort Leonard Wood EOD specialists on the telephone. Thus, any statements that Ricky seems to be insinuating (though not explicitly stating) were inadmissible, were made prior to the allegedly improper discussion he had with Agent Beebe.

Upon review, we have been unable to discover, nor has the appellant directed us to, any evidence of "coercion" in the record, *see Martin*, 63 F.3d at 1429, and the facts demonstrate that a reasonable person in Ricky's position would have understood he or she was free to leave. The trial court's finding that Salyers was not in custody until Agent Beebe read him his rights at 8:30 p.m. on January 22 is more than adequately supported in the record, and thus is not clearly erroneous.

2. Did Detective Eiman Knowingly or Recklessly Include False Statements in his Application for a Search Warrant?

■ Salyers next argues that the trial court should have suppressed evidence ob-

tained pursuant to the first search warrant because Detective Eiman "knowingly include[d] false information in his application for a search warrant of the Salyer's home." Specifically, Salyers argues Eiman knowingly relied upon Rusty Salyer's statement that he (Rusty) had seen a "rocket launcher" in Ricky's possession within the past two to three months, when Eiman knew this statement to be false.

■ A criminal defendant is entitled to a hearing if he or she "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the statement is necessary to the finding of probable cause." *Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Ricky states that Detective Eiman knowingly made a false statement when he applied for the first search warrant, and he manufactures this assertion based upon the suppression hearing testimony of his brother, Rusty. At the hearing, Rusty testified about the events which took place at the sheriff's office, when Rusty originally informed Eiman about the weapons kept at the farmhouse. According to Rusty's suppression hearing testimony, Rusty originally told Eiman he had last seen the rocket launcher *in 1993.* According to Rusty, Eiman allegedly told him that he (Eiman) could only procure a warrant if Rusty changed his statement and alleged that he had seen the rocket launcher *recently.* Rusty claims that based on Eiman's prompting, he (Rusty) decided to lie and agreed to change and tailor his testimony to state that he had seen the rocket launcher *in the past two or three months.* Under these circumstances, Ricky argues, Eiman coerced Rusty into testifying falsely that he had seen the rocket launcher in the past two or three months, and more importantly for purposes of *Franks, supra,* Eiman knew it was a falsehood when he included Rusty's statement in his application for a warrant.

But Rusty's actions prior to the execution of the warrant are totally inconsistent with his later suppression hearing testimony. On January 21, 1997, following his original meeting with Eiman, Rusty signed an affidavit, (which is part of the record), expressly stating that he had the opportunity to view the "rocket launcher" within the past year. Rusty admits that he stated to the state judge who issued the warrant that everything in the affidavit was true. He further admits that he told an investigator from the United States Attorney's Office that every line in the affidavit was accurate. In essence, Rusty, now with a change of heart, argues that he was lying when he spoke to Eiman, lying when he signed the affidavit, lying when he testified to the judge who issued the warrant, but at the suppression hearing he *finally* decided to tell the truth. The district judge found Rusty's testimony to be less than credible and found this scenario unlikely.

The trial court explicitly found that "I do not believe Rusty Salyer when he says that Lt. Eiman knew Rusty's statements about [the time at which he viewed] the shotgun and the launcher were lies. It is far more likely that Rusty now repents giving evidence against his family members and realizes the serious nature of the charges against his brother, Ricky." On the other hand, the court went on and explicitly found Detective Eiman credible, stating: "I believe Eiman when he says that he did not know the statements in the complaint were false . . . perhaps Rusty did lie [when he spoke to Eiman], but I don't believe Eiman knew it at the time."

■ Of course, the judge's credibility assessment is entitled to a great deal of deference. As this court has held on numerous occasions,

> we do not second-guess the sentencing judge because he or she has had the best "opportunity to observe the verbal and non-verbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements," as well as confused or nervous speech patterns *in contrast with merely looking at the cold pages of an appellate record.*

*United States v. Garcia,* 66 F.3d 851, 856 (7th Cir.1995) (citing *United States v. Tolson,* 988 F.2d 1494, 1497 (7th Cir.1993) (quotation omitted)).

In fact, a district judge's credibility determination will not be disturbed unless it is completely without foundation. *See United States v. Ferguson*, 35 F.3d 327, 333 (7th Cir.1994). "[T]he trial judge's ... choice of whom to believe is conclusive on the appellate court unless the judge credits exceedingly improbable testimony." *United States v. Cardona–Rivera*, 904 F.2d 1149, 1152 (7th Cir.1990). In other words, "[w]e must accept the [judge's determination] unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable fact-finder could accept it." *Yusuff*, ·96 F.3d at 986 (citing *United States v. Saunders*, 973 F.2d 1354, 1359 (7th Cir.1992)). Based upon our review of the record, we refuse to disturb the trial judge's findings because the circumstances surrounding Rusty's suppression hearing testimony provide an adequate foundation for the trial judge's finding that Rusty's testimony was false. It is certainly conceivable that Rusty concocted a new version of events once he realized he had set his brother up for a conviction and subsequent punishment.

Another factor prompts us to believe that Detective Eiman did not knowingly lie when he applied for the search warrant. Because of the clarity, specificity and detail in Rusty's statements, Eiman certainly could have believed that Rusty had access to his father's home and had seen the weaponry. Detective Eiman simply "view[ed] the facts through the lens of his experience and expertise." *See Ornelas v. United States*, 517 U.S. 690, 700, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). We can well understand why Eiman chose to believe Rusty's statements.

There is more than sufficient evidence in this record to support the trial judge's finding that Eiman did not knowingly or recklessly include false statements in the warrant application. We agree with the experienced trial judge and refuse to hold that the court's finding rises to the level of clear error.

B. *Whether the District Court Erred when it Found the MK 141 is a "Destructive Device" for Purposes of U.S.S.G. § 2K2.1(b)(3).*

U.S.S.G. § 2K2.1(b)(3) mandates a two level enhancement to the base offense level if "the offense involved a destructive device." The Commentary to section 2K2.1 of the guidelines defines a "destructive device" as follows:

any explosive, incendiary, or poison gas— (i) bomb, (ii) grenade, (iii) rocket having a propellant charge of more than four ounces, (iv) missile having an explosive or incendiary charge of more than one-quarter ounce, (v) mine, or (vi) device similar to any of the devices described in the preceding clauses; any type of weapon which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, and which has any barrel with a bore of more than one-half inch in diameter; or any combination of parts either designed or intended for use in converting any device into any destructive device listed above. For a more detailed definition, refer to 26 U.S.C. § 5845(f).

The "more detailed definition" referred to in 26 U.S.C. § 5845(f) is nearly identical to the Commentary definition, with one exception. Namely, § 5845(f) states that the term destructive device does not include "any device which is neither designed nor redesigned for use as a weapon; any device, although originally designed for use as a weapon, which is redesigned for use as a signaling, pyrotechnic, line throwing, safety or similar device."

The district court found the MK 141 qualified as a "destructive device." The defendant Salyers asks us to review this finding *de novo*, and argues that the MK 141 "clearly falls into the pyrotechnic category," and thus does not qualify as a "destructive device." We disagree. To begin with, contrary to the defendant's assertion that we review this claim *de novo*, the district court's application of the guideline definitions to the characteristics of the MK 141 is reviewed for "clear error." *See United States v. Wyatt*, 102 F.3d 241, 246 n. 7 (7th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1325, 137 L.Ed.2d 486 (1997) (district court's application of § 2K2.1 to facts reviewed for clear error). A trial court's decision does not constitute clear error if it simply represents a choice between two permissible inferences based upon the evidence. *See United States v. Bush*, 79 F.3d 64, 66 (7th Cir.1996).

At Salyers' sentencing hearing, the government proffered one David Shatzner as an expert witness with knowledge about weapons classifications, including the classification of the MK 141 as a destructive device. At the time of the hearing Shatzner was an explosives officer with the ATF in the Explosive Technology Unit, and had served in that capacity for the preceding eight years. Prior to that time, he was an explosives expert in the military and had testified in federal court proceedings on more than 20 occasions, when called upon to explain whether certain devices met the definition of destructive devices under the Federal Firearms Law. Shatzner described the MK 141 and concluded it qualifies as a destructive device. Specifically, Mr. Shatzner testified: "[t]his device was designed as an explosive weapon, not necessarily designed to kill, but designed to incapacitate and temporarily render someone blind or deafened...." He further explained that the MK 141 was designed solely as a weapon, that it contains a quantity of explosives which can kill or injure, and that if set off, the MK 141 blast contains enough pressure to cause injury to internal organs.

The only rebuttal evidence the defendant offered was his own testimony, as he took the stand and asserted, not surprisingly, that the MK 141 is not a destructive device, but rather a diversionary device. The trial judge, after weighing the defendant's self-serving testimony against that of Shatzner, accepted Shatzner's testimony as evidenced by the court's Order on Final Disposition: "the testimony of [Shatzner] states unequivocally that the listed items are destructive devices within the meaning of the law. I credit his opinion and accept it." We give near absolute deference to a court's credibility determinations because the judge observed the witness's testimony first-hand. *See United States v. Howard,* 80 F.3d 1194, 1205 (7th Cir.1996). We hold there is ample evidence in the record supporting the trial judge's finding, and the finding is not clearly erroneous.[7]

## C. Whether the District Court's Application of the Sentencing Guidelines was Improper.

Finally, Salyers challenges the court's application of the United States Sentencing Guidelines in calculating his sentence. We review *de novo* the trial court's interpretation of the Sentencing Guidelines. *See United States v. Mattison,* 153 F.3d 406, 1998 WL 461901, at *5 (7th Cir., Aug.10, 1998) (citing *United States v. Roy,* 126 F.3d 953, 954 (7th Cir.1997)). U.S.S.G. § 4A1.1(c) requires an addition of one point for a previous sentence of less than 60 days. When calculating Salyers' criminal history points, the district judge counted one point pursuant to § 4A1.1(c) for Salyers' previous conviction and 45-day sentence for the North Carolina Assault on a Government Official conviction. U.S.S.G. § 4A1.1(d) requires an additional two criminal history points "if the defendant committed the instant offense while under any criminal justice sentence, including probation...." The judge added two points pursuant to § 4A1.1(d) for committing the instant offense while on probation for the North Carolina state assault conviction. Salyers claims the court's simultaneous addition of points under these two sections constitutes impermissible "double counting." Double counting occurs when a court allows two or more upward adjustments within the guideline range when both adjustments are premised on the same conduct. *See United States v. Williams,* 106 F.3d 1362, 1367 (7th Cir. 1997); *United States v. Compton,* 82 F.3d 179, 183 (7th Cir.1996); *United States v. Haines,* 32 F.3d 290, 293 (7th Cir.1994). The same conduct cannot be described in two different ways such that two different adjustments apply, each of which leads to a separate upward adjustment in point totals. *See*

---

7. In his brief, Salyers also claims the court erred when it found he had "constructive possession" of a Ruger mini-fourteen assault rifle discovered inside the farmhouse. U.S.S.G. § 2K2.1(b)(1) provides for a two level enhancement if the offense involved five to seven "firearms." Firearms include those things found to be destructive devices. *See* U.S.S.G. § 2K2.1, *Commentary, Ap-*

*plication Note No. 1.* Salyers was convicted of possessing five MK 141s and the Ruger rifle, and given the two point enhancement. Because we uphold the trial court's determination that an MK 141 is a destructive device, and Salyers possessed five of these, he qualifies for the two level increase regardless of whether or not he possessed the Ruger rifle.

**1164**

United States v. Kopshever, 6 F.3d 1218, 1224 (7th Cir.1993).

The precise issue Salyers raises was examined and disposed of in Williams, 106 F.3d 1362. There, Williams received one point for his criminal history (having committed a crime in the past), and two additional points for committing the instant crime (possession of firearm by a felon) while on probation. We noted, "Williams argues each adjustment stems from the same conduct: his earlier conviction. We [disagree]: the first adjustment results from the earlier conviction, the second from his current conduct." Williams, 106 F.3d at 1367. Salyers' case is indistinguishable.[8] The inclusion of one criminal history point for his past Assault on a Government Official state conviction is a result of his throwing a grenade at state law enforcement officers in North Carolina in 1995. The addition of two criminal history points for commission of the instant crime (possession of destructive devices) while on probation is based on other felonious conduct: namely, the possession of destructive devices kept in a Wells Cargo trailer first discovered by state officials on January 21, 1997. As was the case in Williams, separate adjustments are proper in Ricky Salyers' case because the adjustments were not premised on the same conduct. The trial judge correctly applied the guidelines in accordance with established precedent, and we agree with his ruling.[9]

## IV. CONCLUSION

The judgment and sentence of the district court are

AFFIRMED.

---

8. In fact, appellant's counsel at oral argument agreed that Williams controls the outcome of this issue, but invited us to re-examine the rule established there. Because Williams is logically sound and comports with the plain reading of the Sentencing Guidelines, we decline to review the well-established rule in Williams.

9. Even if the trial court chose to add two points for committing an offense while on probation, and not to add one point for committing the past offense itself, Salyers would still fall in Criminal History Category Two, because he would have two criminal history points (instead of three). The guidelines categorize an offender as category two if the offender has two or three criminal history points. See U.S.S.G. § 5A.