In the

# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 06-4058 & 06-4213

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*
*Cross-Appellant,*

*v.*

CHARLES M. WOOLSEY,

*Defendant-Appellant,*
*Cross-Appellee.*

———————

Appeals from the United States District Court
for the Southern District of Indiana, New Albany Division.
No. 4:05CR00014-001—**David F. Hamilton**, *Chief Judge.*

———————

ARGUED SEPTEMBER 5, 2007—DECIDED JULY 22, 2008

———————

Before POSNER, RIPPLE, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Charles Woolsey was convicted of drug and firearms offenses after police executed a search warrant at his residence and discovered a cache of guns, cocaine, marijuana, and methamphetamine. On appeal Woolsey challenges the denial of his motion to suppress the evidence seized at his house, as well as the district court's exclusion of two witnesses at his jury trial.

The government cross-appeals and argues that at sentencing the district court erred in refusing to impose a life term on his conviction for possession of methamphetamine with intent to distribute. We affirm Woolsey's convictions but vacate his sentence on the methamphetamine count and remand with directions to impose a life term on that count.

## I.

### A. Initial Investigation

In March 2005, after police in Paoli, Indiana, had received complaints of drug activity, Police Chief Barry Chastain and Assistant Police Chief Josh Babcock visited the home of Melissa McCoy. The man who answered the door—Robert "Bo" Tuell—exhibited signs of heavy drug abuse, including sores on his face. Chastain and Babcock knew Tuell, if distantly, and had noticed him around town in recent months in worsening health. The officers had also heard rumors that Tuell was selling methamphetamine. Their conversation was brief. Chastain and Babcock told Tuell that if he continued to use and sell drugs he would "end up back in jail or worse," that he needed to stop, and that help was available at a local drug rehabilitation center. Neither officer threatened arrest.

A few weeks later Tuell contacted Chastain and asked for assistance. Tuell explained that he was "strung out," had ruined a lot of lives, and no longer wanted to be involved with drugs. Chastain then contacted a local rehabilitation counselor, and the three men met to discuss Tuell's problems. During the meeting Tuell admitted that he was a drug dealer—and that he was selling drugs for Charles Woolsey. Chastain invited Tuell to elaborate,

although he did not offer Tuell any reward for the information or threaten Tuell with arrest. Nevertheless, Tuell told Chastain that in the previous week he had seen over two pounds of methamphetamine at Woolsey's house as well as marijuana and cocaine, all of which could be found in Woolsey's tool box, a lock box, or in various trash cans inside the house. Tuell also mentioned that Woolsey had recently traveled to Texas, as he did each month, to obtain a fresh shipment of drugs. When asked to identify Woolsey, Tuell reported that Woolsey drove a mid-1990s blue Chevrolet extended-cab pickup truck. Tuell also provided a home phone number and cell phone number for Woolsey. Chastain immediately communicated this information to Babcock, who supervised all drug investigations.

In an effort to corroborate Tuell's statements, Babcock spoke with Indiana State Trooper Jonathan Lamb, who confirmed Tuell's description of Woolsey's pickup. Babcock also spoke with Sergeant Paul Andry of the Indiana State Police, who told Babcock that Tuell had once before provided reliable information that led to a criminal conviction, albeit ten to twelve years earlier. Babcock then prepared an affidavit of probable cause (summarizing the information provided by Tuell, Lamb, and Andry) and a proposed search warrant for Woolsey's house. In his affidavit, Babcock revealed that Tuell (described in the affidavit as a confidential informant) was a drug addict:

> The C.I. is neither seeking leniency nor financial compensation in exchange for the information that they have [sic] given. The C.I. is concerned about the use of illegal drugs, especially methamphetamine, in the county. The C.I. also stated that they was [sic]

addicted to methamphetamine and needs help for his addiction.

A state judge approved the search warrant.

On April 7, 2005, law enforcement officers executed the search warrant and discovered approximately one-half pound of cocaine, two pounds of methamphetamine, thirty-one pounds of marijuana, numerous guns, and $16,000 in currency in and around Woolsey's home. Federal authorities then took over the investigation and charged Woolsey in a superseding indictment with possession with intent to distribute 500 grams or more of methamphetamine, *see* 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii), possession with intent to distribute cocaine, *see id.* U.S.C. § 841(a)(1), possession with intent to distribute marijuana, *see id.* U.S.C. § 841(a)(1), (b)(1)(D), possession of a firearm in furtherance of a drug trafficking crime, *see* 18 U.S.C. § 924(c)(1)(A)(i), and possession of a firearm by a felon, *see id.* U.S.C. § 922(g)(1).

### B. District Court Proceedings

Before trial Woolsey moved to suppress the evidence seized from his home because, he maintained, the search warrant was not supported by probable cause. Woolsey argued that there was no significant corroboration of Tuell's statements prior to the search and Tuell's reliability as an informant could not rest on a single instance of useful information provided over a decade ago. Woolsey also sought suppression under a second, alternative theory, asserting that Babcock's affidavit provided false information and omitted material facts that undermined probable cause. *See Franks v. Delaware*, 438 U.S. 154 (1978). According to Woolsey, the supporting affidavit mis-

characterized Tuell as a concerned citizen and deceived the issuing judge by failing to mention that Tuell was a drug dealer, that Chastain and Babcock had threatened him with arrest, and that ten years had passed since he last cooperated with law enforcement. Moreover, Woolsey argued, Tuell now denied that he ever spoke to Chastain about Woolsey's marijuana or Woolsey's supplier in Texas.

Following a suppression hearing, the district court concluded that the supporting affidavit did not establish probable cause but held, nonetheless, that suppression was inappropriate in light of the exception enunciated in *United States v. Leon*, 468 U.S. 897 (1984). Despite the absence of probable cause, the district court explained, the officers had obtained and executed the warrant in good faith. And Babcock had not, according to the court, intentionally or recklessly misled the judge who issued the warrant:

> So, even with the deference that a court in my situation owes to the judge at the time, and even in light of the flexible and common sense approach we take to issues of probable cause, I think this was too thin to establish probable cause. There was no corroboration of anything incriminating and it all depended on the uncertain reliability of Mr. Tuell.
>
> . . . .
>
> There are differences between what Chastain and Babcock remember about what Tuell told Chastain and what Chastain relayed to Babcock, and what Tuell remembers about whether he said anything about marijuana, and whether he told Chastain anything about his source on or about April 7th, as opposed to a week or so later.

I think Chastain and Babcock are credible. I don't think what they put in the affidavit is a hundred percent accurate, but I do believe that they were being honest in relaying the information.

I also don't find that there were deliberate omissions or deliberate deceptions in what was presented to the judge. They let the judge know that Tuell was a methamphetamine addict. The information that they had about whether he was involved in dealing was sketchy enough and dicey enough that I don't believe they acted irresponsibly and certainly not dishonestly by leaving that information out.

After this ruling, Woolsey requested that the district court compel the appearance at trial of two men in state custody, Mark Frentz and David Turner. *See* 28 U.S.C. § 2241(c)(5). Woolsey informed the court that he anticipated eliciting the following testimony: prior to Woolsey's arrest, Frentz—who at the time was in the county jail awaiting trial on unrelated drug and murder charges—had suspected that Woolsey was involved romantically with his girlfriend, and had tried to retaliate by soliciting other inmates, including Turner, to kill Woolsey or plant drugs at his residence. Despite skepticism that the two men could provide admissible testimony even if they were willing, the court granted Woolsey's request for writs of habeas corpus ad testificandum. *See id.*

On the second day of trial, Frentz and Turner proffered their testimony outside the presence of the jury. Not surprisingly, Frentz invoked his Fifth Amendment right against self-incrimination and refused to answer questions about his conversations with other jail inmates. He did, however, deny asking anyone in jail to plant drugs

on Woolsey's property. The district court in turn con-
cluded that Frentz had no relevant testimony to offer
the jury and refused to permit his appearance "simply
for the purpose of inviting him to take the 5th Amend-
ment in front of the jury."

Turner's proffer was more complex. The district court
summarized the proposed testimony following a series
of questions posed to Turner:

> The critical testimony, as I understand it, is that
> Mr. Turner would testify that shortly after Mr. Frentz
> arrived in his cell block . . . in late January of 2005,
> Mr. Frentz expressed jealousy and hatred towards
> Mr. Woolsey, and expressed a desire to either kill
> Mr. Woolsey or set him up by having someone plant
> drugs at Mr. Woolsey's property.

> The testimony would also be that Mr. Turner did not
> accept this invitation; that Mr. Frentz remained in
> custody at all relevant times, as did Mr. Turner; and
> that there is no evidence from Mr. Turner that Frentz
> invited anyone else to carry out such a scheme.

The district court concluded that Turner's testimony
would not be relevant because it established only
Frentz's motive but not opportunity. After all, the court
noted, "we know that Turner didn't do it; Frentz didn't
do it himself; and there's no evidence that anybody else
did." Furthermore, the court reasoned, the particular
frame-up that Turner had said Frentz solicited was in-
consistent with the evidence found in Woolsey's home.
Turner had reported that Frentz proposed building a
methamphetamine laboratory in an outbuilding on
Woolsey's property and scattering loose marijuana else-
where on the premises. But, as the court observed, the

methamphetamine, cocaine, and marijuana actually seized from Woolsey's residence was worth over $40,000, an amount that far exceeded what Frentz could have mustered, however indirectly, after *his* arrest and the seizure of his own drugs. Even if Turner's testimony was relevant, the court continued, it would not satisfy Federal Rule of Evidence 403 because its potential to delay the trial or confuse and mislead the jury exceeded its slight probative value ("virtually zero"). Finally, the court added, the hearsay exception for statements against interest would not authorize Turner to testify about Frentz's jailhouse solicitation because of the absence of corroborating circumstances that might support the trustworthiness of the statements attributed to Frentz. *See* FED. R. EVID. 804(b)(3).

At the conclusion of trial, the jury found Woolsey guilty of all five offenses charged in the superseding indictment.

### C. Sentencing

Prior to trial the government filed an enhancement information, *see* 21 U.S.C. § 851, detailing two prior drug felonies that would trigger a mandatory term of life imprisonment if, as was alleged in the first count of the superseding indictment, Woolsey possessed for distribution at least 500 grams of methamphetamine, *see* 21 U.S.C. § 841(b)(1)(A)(viii). At sentencing Woolsey conceded that his 1997 Indiana conviction would count for enhancement purposes, but he challenged the use of his 1974 federal conviction. In 1974, Woolsey explained, an Arizona district court had sentenced him to two years' probation under the Federal Youth Corrections Act for

possessing with intent to distribute approximately 125 pounds of marijuana. Woolsey recounted that his probation officer had informed him that this conviction would be set aside automatically upon successful completion of his probation. But this information was not accurate, as Woolsey now understood; only an *early* discharge of probation had the effect of setting aside a conviction under the Act, and because Woolsey's term was not discharged early, his only recourse after he completed his probation in 1976 was to petition the district court in Arizona to grant him a nunc pro tunc early unconditional discharge and set aside his conviction. *See Tuten v. United States*, 460 U.S. 660, 668 (1983); *United States v. Sumner*, 226 F.3d 1005, 1009-10 (9th Cir. 2000); *United States v. Gardner*, 860 F.2d 1391, 1399 (7th Cir. 1988). Woolsey professed that he was unaware of this requirement until seeing the government's enhancement information, which explained why his conviction was still on the books.

Eager to avoid life imprisonment, Woolsey asked the district court in this case to set aside his 1974 conviction. The government urged the court to reject the motion for numerous reasons, chief among them was that the court lacked jurisdiction to fulfill the request. Furthermore, the government insisted, Woolsey's maneuvering constituted a collateral attack on his earlier conviction—and the clock had long since run on the five-year statute of limitations found in 21 U.S.C. § 851(e). The court responded by postponing Woolsey's sentencing so he could seek relief from the Arizona district court. But after nearly five months had passed with no ruling from Ari-

zona,[1] the court decided to proceed with sentencing but disregard the 1974 conviction for purposes of § 841(b)(1)(A):

> I believe it is also appropriate under these circumstances to not count the 1974 marijuana conviction for this purpose. On that issue, with respect to both the guidelines and the 851 issue, I will say that it seems to me that there is no apparent reasons in this record why the defendant should not have been discharged early as to what is the customary practice as was intended and, in essence, the Court ought to treat as having been done what should have been done under general equitable powers.

Still, even one prior felony drug conviction subjected Woolsey to a twenty-year mandatory minimum. *See* 21 U.S.C. § 841(b)(1)(A)(viii). And his § 924(c) charge carried an additional, consecutive five-year mandatory minimum term. *See* 18 U.S.C. § 924(c)(1)(A)(i). The applicable guidelines imprisonment range, without regard to the statutory minimums, was 235 to 293 months after pairing Woolsey's total offense level of 36 with his criminal history category of III. Ultimately, the court imposed concurrent sentences totaling 240 months on the drug and § 922(g)(1) counts plus the consecutive 60-month term on the § 924(c) count. All told, Woolsey would serve 300 months in prison.

---

[1] The Arizona court eventually denied the motion on February 5, 2007, more than three months after Woolsey was sentenced in this case.

## II.

### A.  The *Leon* Question

On appeal Woolsey renews his argument that he was entitled to suppression because, according to Woolsey, *Leon*'s good-faith exception cannot save the search warrant. The government takes up the *Leon* question as well but does not probe whether probable cause supported the warrant—the preceding question.

A faulty warrant and an illegal search do not necessarily entitle a defendant to suppression of evidence. *United States v. Mykytiuk*, 402 F.3d 773, 777 (7th Cir. 2005). The Supreme Court announced in *Leon*, 468 U.S. at 923-26, that suppression is inappropriate if the police officers who executed a later-invalidated search warrant did so in good faith. *Leon*'s rationale is plain: the exclusionary rule is designed to deter future unlawful police misconduct. Inherent in *Leon*'s exception to the exclusionary rule is "the view that permitting people to get away with crime is too high a price to pay for errors that . . . stem from negligence rather than disdain for constitutional requirements." *United States v. Cazares-Olivas*, 515 F.3d 726, 728 (7th Cir. 2008).

An officer's decision to obtain a warrant is prima facie evidence of good faith. *United States v. Otero*, 495 F.3d 393, 398 (7th Cir. 2007); *Mykytiuk*, 402 F.3d at 777. A defendant may rebut this presumption by showing that the judge who issued the warrant abandoned his neutral, detached role and acted as a rubber stamp for the police, or that the affiant intentionally or recklessly misled the judge, or that the supporting affidavit is so lacking in indicia of probable cause that an officer's belief in its existence would have been entirely unreason-

able, or that the warrant itself is so facially deficient that the executing officers could not reasonably have believed it to be valid. *See Leon*, 468 U.S. at 923; *Otero*, 495 F.3d at 398. We review de novo the legal conclusion that a law enforcement officer reasonably relied on a subsequently invalidated search warrant. *See United States v. Koerth*, 312 F.3d 862, 865 (7th Cir. 2002).

Woolsey contends that Babcock could not have obtained the warrant in good faith because his affidavit conveys false information and omits significant facts that undermine probable cause—all in an effort to deceive the issuing judge. *See Leon*, 468 U.S. at 923; *Franks*, 438 U.S. at 155-56. Woolsey identifies two allegedly false statements in the affidavit: that Tuell provided Chastain information about Woolsey's supplier and that he also reported the presence of marijuana in Woolsey's home. Woolsey's brief catalogues a number of purported omissions as well: that Chastain and Babcock threatened Tuell with arrest before he provided any information, that Tuell was a known drug dealer, and that Tuell's earlier cooperation with law enforcement was an isolated incident over a decade ago.

Woolsey's list is not enough to win his appeal, however. In order to prevail, a defendant must establish, by a preponderance of the evidence, that the affidavit contained false or misleading information, that the deceptive information was included intentionally or with reckless disregard for the truth, and that the information in question was essential to the finding of probable cause. *See Leon*, 468 U.S. at 923; *Franks*, 438 U.S. at 155-56; *United States v. Hoffman*, 519 F.3d 672, 675 (7th Cir. 2008). Because material omissions can be equally deceptive, a defendant may also challenge an affidavit by showing

that the affiant intentionally or recklessly omitted material information. *See Hoffman*, 519 F.3d at 675.

Woolsey's challenge falters because he did not establish any intentional or reckless falsehood or omission in the affidavit. Woolsey argued before the district court that the statements about marijuana and about Woolsey's drug source are false because, at the suppression hearing, Tuell denied making them to Chastain. But Chastain testified at the same hearing that Tuell *did* tell him about the marijuana and Woolsey's source. And the district court did not choose to credit one account over another because the court found that any erroneous information included in Chastain's affidavit was inadvertent and not reckless. On this point Woolsey is silent, and we are unpersuaded by his suggestion that the court clearly erred in its finding. *See United States v. Biggs*, 491 F.3d 616, 621 (7th Cir. 2007); *United States v. Salyers*, 160 F.3d 1152, 1161-62 (7th Cir. 1998) (emphasizing that judge's credibility determination at *Franks* hearing is "entitled to a great deal of deference").

As to the omissions, Woolsey also failed to develop any argument before the district court that Babcock intentionally or recklessly deceived the issuing judge. *See Franks*, 438 U.S. at 155-56; *United States v. Rodriguez-Suazo*, 346 F.3d 637, 648-49 (6th Cir. 2003); *United States v. Garey*, 329 F.3d 573, 577-78 (7th Cir. 2003). Indeed, some of Woolsey's proposed omissions are factually infirm. For example, at the suppression hearing Babcock, Chastain, *and* Tuell denied any threat of arrest. More importantly, Woolsey did not examine, in any depth, whether the omitted information would have been material to the determination of probable cause. *See Franks*, 438 U.S. at 155-

56. Instead Woolsey identified three facts—some of them disputed—that he believes Babcock should have included in the affidavit. Woolsey then assumes that their omission was a deliberate act that deceived the issuing judge into a finding of probable cause. We require more to rebut the presumption of good faith. *See Leon*, 468 U.S. at 923; *Franks*, 438 U.S. at 155-56; *Garey*, 329 F.3d at 577-78.

Woolsey had a second suppression theory before the district court, although he abandoned it prematurely. His argument was, essentially, that the affidavit did not establish probable cause and therefore suppression was appropriate. But that ignores *Leon* altogether. The very point of that decision is that suppression does not necessarily follow from a determination that probable cause was lacking. The question of probable cause is only the first step, and on this question the district court agreed with Woolsey that probable cause was absent. The next step for Woolsey was to argue that the affidavit was so lacking in indicia of probable cause that an officer's belief in its existence would have been completely unreasonable. *See Leon*, 468 U.S. at 923; *Koerth*, 312 F.3d at 868. Woolsey never made this argument, but it would have failed in any event. A defendant can establish unreasonable reliance only if

> courts have clearly held that a materially similar affidavit previously failed to establish probable cause under facts that were indistinguishable from those presented in the case at hand [or] the affidavit is so plainly deficient that any reasonably well-trained officer would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant.

*Koerth*, 312 F.3d at 869 (citations and quotation marks omitted). The first possibility is out. We cannot say that courts have clearly held that this affidavit—which states that a reliable informant spied a specific quantity of drugs inside of a drug dealer's residence within the past week and police officers corroborated at least some of the informant's allegations—is insufficient. *Cf. United States v. Garcia*, 528 F.3d 481, 486-88 (7th Cir. 2008); *Owens v. United States*, 387 F.3d 607, 608 (7th Cir. 2004); *United States v. Peck*, 317 F.3d 754, 757-58 (7th Cir. 2003). Nor can we say that the affidavit is so plainly deficient that Babcock should have known that it would not amount to probable cause. Again, the document conveys considerable detail, including the extent to which Chastain and Babcock had corroborated Tuell's statements, the firsthand observations of Tuell, and the amount of time that had passed since Tuell saw the drugs. *See Koerth*, 312 F.3d at 868.


**B. Exclusion of Witnesses**

Woolsey also protests the district court's decision to exclude the testimony of Frentz and Turner at trial. We review evidentiary rulings of this sort for abuse of discretion. *United States v. Evans*, 486 F.3d 315, 325 (7th Cir. 2007).

We begin with Frentz. Woolsey insists that Frentz's "admission to participation in the scheme [to plant drugs] and the execution thereof is admissible to show that Woolsey neither had knowledge of the drugs presence or intent to distribute them." The district court might have agreed except that Frentz never admitted anything of the sort. To the contrary, when questioned outside

the jury's presence, Frentz *denied* speaking with anyone in jail about planting drugs on Woolsey's property. And when the questions during that proffer session turned to Frentz's contact with Turner in jail, Frentz invoked the Fifth Amendment and refused to answer. Yet Woolsey contends that he was entitled to question Frentz in front of the jury, if only to have Frentz again refuse to testify. He is mistaken. A jury may not draw any inference from an individual's decision to exercise his right against self-incrimination under the Fifth Amendment. *See United States v. Loggins,* 486 F.3d 977, 982 (7th Cir. 2007); *United States v. Mabrook*, 301 F.3d 503, 507 (7th Cir. 2002); *see also* 2A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 407 (3d ed. 2000) ("[I]t is improper to put a witness on the stand merely to have him exercise before the jury his privilege against self-incrimination."). Woolsey's only purpose in calling Frentz would have been to invite the jury to infer from Frentz's refusal to testify that Woolsey was not culpable. The district court was correct to prevent that occurrence.

As to Turner, Woolsey argues that his testimony was admissible under various hearsay exceptions. *See* FED. R. EVID. 804(b)(3), 807; *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). But Woolsey neglects to address the district court's core ruling—that Turner's testimony was not relevant because "there's no evidence that anybody . . . was in a position to carry this out." As the court explained, "Mr. Frentz may have had a motive to do harm to Mr. Woolsey, but there is no evidence he had the means or opportunity to do so." Woolsey also ignores the court's conclusion that even if Turner's testimony were relevant, its probative value was substantially out-weighed by the threat of delaying the trial or confusing and misleading the jury. *See* FED. R. EVID. 403.

Evidence is relevant if it tends "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." FED. R. EVID. 401. One test of relevance is whether "its exclusion would leave a chronological and conceptual void in the story." *United States v. Westbrook*, 125 F.3d 996, 1007 (7th Cir. 1997) (quotation marks and citations omitted); *see United States v. Bailey*, 510 F.3d 726, 737-38 (7th Cir. 2007). As the district court noted, Turner's testimony would have been that he did not accept Frentz's invitation nor did he know of anyone who did. Moreover, the scheme that Turner outlined—constructing a methamphetamine lab on Woolsey's property and scattering loose marijuana—was at odds with the actual evidence in this case. The court urged Woolsey to present "more efficient or stronger evidence suggesting that this was actually any kind of plausible scheme, that Mr. Frentz might have had the means or opportunity to carry out something like this." Woolsey was unable to do so, however, and we detect no abuse of discretion in excluding Turner's testimony.

### C. Sentencing Error

The government cross-appeals to challenge the district court's decision to ignore, for purposes of § 841(b)(1)(A), Woolsey's 1974 federal conviction. We review questions of law related to sentencing de novo. *See United States v. Mendoza*, 510 F.3d 749, 754 (7th Cir. 2007); *United States v. Tyra*, 454 F.3d 686, 687 (7th Cir. 2006).

Underlying the district court's decision is the Federal Youth Corrections Act (YCA), since repealed, which authorized a sentencing court to unconditionally dis-

charge a youth offender from probation before the end of the term and thus automatically set aside the conviction. *See* 18 U.S.C. § 5021(b) (repealed 1984); *Tuten v. United States*, 460 U.S. 660, 662-68 (1983). The aim of the YCA was to combat recidivism and promote the rehabilitation of youth offenders by offering relief from the social and civil disabilities that accompany a criminal conviction. *Tuten*, 460 U.S. at 663-65. The Supreme Court clarified in *Tuten*, however, that only *early* discharge would result in the conviction being set aside; simply completing probation was not enough. *Id.* at 668. And in order to earn the early discharge a probationer had to demonstrate good behavior to the sentencing court before the probationary period ended. *Id.* at 667-68. If a youth offender believed that the sentencing court's failure to grant an early discharge was a mere oversight, however, he could move that court—even after completion of probation—to grant him an early unconditional discharge nunc pro tunc. *Id.* Woolsey argued at sentencing that the Arizona district court's inaction was just such an oversight, and one that could be corrected at this point by the federal court in Indiana.

The Indiana district court was not free to ignore Woolsey's earlier conviction. First, as *Tuten* makes clear, the court that imposed a sentence under the YCA should be the one to exercise the discretion afforded by the Act. *See id.* at 662-63, 668. And we now know that the Arizona court was not inclined to grant the request. Second, Woolsey's efforts amounted to a collateral attack on his prior conviction to avoid enhancement of his sentence. But § 851(e) bars any challenge to "the validity of any prior conviction alleged under this section which occurred more than five years before the date of the

information alleging such prior conviction." We have upheld the constitutionality of that provision, *see United States v. Magana*, 118 F.3d 1173, 1209-11 (7th Cir. 1997); *United States v. Arango-Montoya*, 61 F.3d 1331, 1338 (7th Cir. 1995); *see also United States v. Henderson*, 320 F.3d 92, 104 (1st Cir. 2003) (collecting cases), and we require only that the sentencing court ask whether the defendant denies the prior conviction, "since it is always possible that the government was mistaken and there was no prior conviction, or that the facts alleged in the govern-ment's information of prior conviction are incorrect." *Arango-Montoya*, 61 F.3d at 1339. Woolsey never denied the 1974 conviction, and the five-year window closed some time ago.

Even if § 851(e) posed no obstacle to Woolsey, he would still have been barred from challenging his 1974 conviction at sentencing. Sentencing is not the right time to collaterally attack a prior conviction unless the prior conviction was obtained in violation of the right to counsel—which Woolsey does not suggest. *See Daniels v. United States*, 532 U.S. 374, 378 (2001); *Custis v. United States*, 511 U.S. 485, 490-91 (1994); *United States v. Dahler*, 171 F.3d 441, 443 (7th Cir. 1999); *Arango-Montoya*, 61 F.3d at 1336. Furthermore, we have admonished district courts that the statutory penalties for recidivism found in § 841(b)(1)(A) are not optional, even if the court deems them unwise or an inappropriate response to repeat drug offenders. *See United States v. Cannon*, 429 F.3d 1158, 1160-61 (7th Cir. 2005). "[T]he point of such statutes is to limit judicial discretion rather than appeal to the court's sense of justice." *Id.* at 1160. Accordingly, the decision to disregard Woolsey's prior conviction in light of what the court believed "should have been done" three decades earlier was incorrect.

CONCLUSION

We AFFIRM Woolsey's convictions but VACATE his sentence as to the methamphetamine count and REMAND with instructions to impose a sentence of life imprisonment on that count.