# Syllabus

Chief Justice:
Robert P. Young, Jr.

Justices:
Michael F. Cavanagh
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack
David F. Viviano

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Corbin R. Davis

## PEOPLE v ELLIOTT

Docket No. 144983. Argued March 6, 2013 (Calendar No. 9). Decided June 25, 2013.

Samuel Lee Elliott was convicted by a jury in the Jackson Circuit Court of armed robbery, MCL 750.529. A man had entered a gas station, told the attendant he had a gun, and demanded the store's money. Elliott, who had been on parole following a prior conviction, was arrested the following day pursuant to a warrant for failing to report to his parole officer. Elliott's brother had contacted the police, informing them that Elliott had robbed the gas station. Elliott was interrogated by the police after he was informed of his rights pursuant to *Miranda v Arizona*, 384 US 436 (1966). The police stopped questioning Elliott after he invoked his right to counsel. Three days later, while still in jail, Elliott confessed to a parole officer when she questioned him about the robbery in conjunction with serving Elliott with notice of additional parole-violation charges. The parole officer had not informed Elliott of his *Miranda* rights before questioning him. Defense counsel moved to suppress the confession. The court, Thomas D. Wilson, J., denied the motion, concluding that the parole officer had not acted as a law enforcement officer when questioning Elliott. Following his conviction and sentencing, Elliott appealed. The Court of Appeals, BECKERING, P.J., and OWENS and SHAPIRO, JJ., reversed and remanded for a new trial, holding that a parole officer is a law enforcement officer for *Miranda* purposes, that Elliott was in custody when the parole officer interrogated him, that Elliott's confession was inadmissible because he had invoked his right to counsel before questioning, and that the trial court's error in admitting the confession was not harmless. 295 Mich App 623 (2012). The Supreme Court granted the prosecution's application for leave to appeal. 491 Mich 938 (2012).

In an opinion by Justice MARKMAN, joined by Justices KELLY, ZAHRA, and VIVIANO, the Supreme Court *held*:

In *Miranda*, the United States Supreme Court held that the Fifth Amendment's prohibition against compelled self-incrimination requires that the accused be given a series of warnings before being subjected to custodial interrogation. The right to have counsel present is a corollary of the right against compelled self-incrimination because the presence of counsel during custodial interrogation is one way in which to ensure that statements made during custodial interrogation are not the product of compulsion. If custodial interrogation is not preceded by an adequate warning, statements made during the interrogation may not be introduced into evidence at the accused's trial. Once the accused has invoked the right to counsel, the accused may not be subjected to further custodial interrogation until counsel has

been made available to the accused unless the accused initiates further communication, exchanges, or conversations with the police. In the absence of a post-invocation custodial interrogation, there can be no infringement of the right to have counsel present during a custodial interrogation. Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his or her freedom of action in any significant way. When a parolee is incarcerated for an alleged parole violation, "custodial" means more than just the normal restrictions that exist as a result of the incarceration; incarceration alone is not enough to create a custodial situation for *Miranda* purposes. Whether incarceration constitutes custody for *Miranda* purposes depends on whether it exerts the coercive pressure that *Miranda* was designed to guard against—the danger of coercion that results from the interaction of custody and official interrogation. The first step is to determine whether the accused's freedom of movement was curtailed. If so, the court must then ask whether the relevant environment presented the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*. In this case, the meeting took place in the jail library, it lasted only 15 to 25 minutes, Elliott was not physically restrained, and a reasonable person in Elliott's position, a parolee, would be aware that a parole officer acts independently of the police who placed him or her in custody and that the parole officer has no control over the jail, its staff, or the individuals incarcerated there. On balance, these facts were consistent with an environment in which a reasonable person would have felt free to terminate the interview and leave. Thus, Elliott's freedom of movement was not curtailed. However, even if Elliott's freedom of movement was curtailed, Elliott failed to show that the meeting presented the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*. Elliott presented no evidence of coercion or psychological intimidation. Any inherently coercive attributes of the parolee/parole officer relationship, which the Court of Appeals relied on in reaching its decision, were inapplicable in this case because the parole officer who questioned Elliott was not Elliott's supervising officer and thus they did not have the kind of unique relationship of trust and confidence that the Court of Appeals assumed that they did. Viewing the totality of the circumstances, there was no custodial interrogation. Because Elliott was not subjected to custodial interrogation by the parole officer, even if she was a law enforcement officer, neither Elliott's right to be given a series of warnings before custodial interrogation nor his right to have counsel present during custodial interrogation was violated. Accordingly, the trial court did not err by admitting Elliott's confession.

Judgment of the Court of Appeals reversed; defendant's conviction and sentence reinstated.

Chief Justice YOUNG, concurring, agreed with the majority's decision to reverse the judgment of the Court of Appeals and reinstate Elliott's conviction and sentence. Even if the parole officer's interrogation of Elliott was a custodial interrogation by a law enforcement officer, defendant waived any right to have counsel present during the interrogation. The parole officer testified at trial that Elliott had submitted a letter to the police indicating that he wanted to speak with them again and that defendant had reiterated that request when speaking with her. Thus, Elliott initiated further communication, exchanges, or conversations with the police, and the parole officer did not violate Elliott's Fifth Amendment rights.

Justice MCCORMACK, joined by Justice CAVANAGH, dissenting, asserted that the Court of Appeals correctly reversed Elliott's conviction and remanded for a new trial, although she agreed with the majority that the dispositive issue was whether Elliott was subjected to custodial interrogation, not the nature of the relationship between Elliott and the parole officer. Because *Miranda* applied to the initial questioning of defendant by the police and Elliott had requested counsel, Elliott could not be subjected to further custodial interrogation about the robbery until counsel had been made available to him or he initiated communication. The parole officer's questioning of Elliott violated his Fifth Amendment rights under *Edwards v Arizona*, 451 US 477 (1981), because the custodial environment established at the initial police interview never ceased and defendant did not initiate the conversation with the parole officer. Alternatively, Justice MCCORMACK asserted that the parole officer's questioning of Elliott constituted its own custodial interrogation for *Miranda* purposes. Justice MCCORMACK concluded that Elliott had not waived his Fifth Amendment right to counsel given that Elliott did not initiate the interview with the parole officer, that the prosecution never made a waiver argument, and that Elliott's alleged letter to the police was not in the record.

©2013 State of Michigan

# Opinion

Chief Justice:          Justices:
Robert P. Young, Jr.    Michael F. Cavanagh
                        Stephen J. Markman
                        Mary Beth Kelly
                        Brian K. Zahra
                        Bridget M. McCormack
                        David F. Viviano

FILED JUNE 25, 2013

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellant,

v                                  No. 144983

SAMUEL LEE ELLIOTT,

      Defendant-Appellee.

BEFORE THE ENTIRE BENCH

MARKMAN, J.

We granted leave to appeal to consider whether the trial court erred by admitting defendant's confession to a parole officer. The Court of Appeals held that the admission of defendant's confession violated *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966), and *Edwards v Arizona*, 451 US 477; 101 S Ct 1880; 68 L Ed 2d 378 (1981), because Evans was a "law enforcement officer" for purposes of *Miranda*. We respectfully disagree because this is not a sufficient condition for the application of these decisions. Even if every parole officer constitutes a "law enforcement officer," neither an

accused's right under *Miranda* to be given a series of warnings nor an accused's right

under *Edwards* to have counsel present apply absent "custodial interrogation" by the

officer. Because defendant was not subjected to "custodial interrogation" by the parole

officer as that term has come to be understood under *Miranda* and its progeny, neither

defendant's *Miranda* nor defendant's *Edwards* rights were violated, regardless of

whether the parole officer was a law enforcement officer. Thus, the trial court did not err

by admitting defendant's confession. By focusing on the wrong constitutional question,

the Court of Appeals considerably expanded the domain of *Miranda*, particularly with

regard to parole officers. Accordingly, we reverse the judgment of the Court of Appeals

and reinstate defendant's conviction and sentence.

## I. FACTS AND HISTORY

In 2006, defendant was convicted of unarmed robbery in violation of MCL

750.530, and the trial court sentenced him to serve a prison term of 3 to 15 years.[1] In

February 2010, at the discretion of the parole board, defendant was granted parole and

---

[1] Defendant was adjudicated responsible as a juvenile in 1982 for assault and battery and in 1983 for fourth-degree criminal sexual conduct. In 1987, defendant pleaded guilty to minor in possession. In 1990, he pleaded guilty to operating a vehicle while under the influence of alcohol, and in 1991, he pleaded guilty to three counts of assault and battery and one count of disturbing the peace. In that same year, he also pleaded guilty to assaulting a police officer and, when he violated probation, he was sent to prison. Also in 1991, in separate cases, he pleaded guilty to malicious destruction of property over $100 and malicious destruction of property under $100. In 1992, he pleaded guilty to misdemeanor resisting a police officer and spent 20 days in jail. In 1993, he pleaded guilty to both possessing an open intoxicant and urinating in public. In 1994, he was convicted of unarmed robbery and sentenced to 5 to 30 years in prison. In 2003, shortly after his release from prison, he pleaded guilty to resisting a police officer and received yet another prison term.

provisionally released from prison. Upon release, defendant was placed under the supervision of a parole officer and required to abide by certain conditions of parole. These conditions included that defendant not engage in behavior that constitutes a violation of any federal, state, or local law, that he not use or possess controlled substances, and that he follow the parole officer's instructions and report as required by the officer.

On June 17, 2010, defendant was taken into custody by police pursuant to a warrant for failing to report, and the next day, his parole officer, Jason Golightly, served defendant with a notice of parole violation pertaining to that failure. On the same day, after advising defendant of his *Miranda* rights, detectives of the Jackson Police Department questioned defendant concerning a robbery that had occurred at approximately 4:00 a.m. on June 16, 2010, at a Jackson gas station. After voluntarily answering several questions, defendant requested an attorney. The police then discontinued the interrogation.

On June 21, 2010, while defendant was still incarcerated, his parole officer was on vacation, so another officer, Cheryl Evans, went to the jail to serve defendant with an amended notice of parole violation that identified three additional parole violations, one of which related to the June 16 robbery.[2] Evans testified as follows regarding what occurred at the jail:

---

[2] Before going to the jail, Evans reviewed the police report that was created following the robbery. She learned from another parole officer that defendant's brother had turned defendant in. She also talked to a detective, Ed Smith, who had questioned defendant at

3

*Q.* And what, exactly does ["serve him parole violation charges and get his statement"] mean? What do you do? What's the process when that happens?

*A.* When a person is served with a parole violation charge, when we determine they -- or we believe they have violated a condition of their parole, we have charges made up. They're on a piece of paper.

We then go and meet with the person. We serve them the charges, which means I say "Count I," "Count II" -- or, for him, it was Count -- it was an additional count, so it was Count III, Count IV, Count V. And then I review it with him. I ask him for a statement. We talk a little bit. And then he decides whether he signs the bottom -- not saying he's guilty -- just signs that he received the charges.

Then he's offered a preliminary parole violation hearing, which is a probable cause hearing. And, again, he waived that, but waiving that does not admit he's guilty. It's just that he's waiving the preliminary hearing.

*Q.* So, did you do all this with the Defendant?

*A.* Yes.

* * *

*Q.* And did he give you a statement?

*A.* Yes, he did.

*Q.* Did one of the charges have to do with the robbery at the Admiral gas station?

*A.* Yes.

*Q.* Did he give you a statement as to those charges?

*A.* Yes.

---

the jail a few days earlier. Evans testified that "what we generally do is, if they're in the middle of an investigation, we just ask them whether or not -- if I can go talk to the person without interfering with their investigation, because our issue is separate than theirs." Smith testified that he told Evans that defendant had requested an attorney, but Evans testified that she did not recall Smith telling her that.

*Q.* And what did he say?

*A.* We talked generally about everything that was going on and he said that he'd been having a rough time. He said that he was living with his cousin, Laurie Brooks, who has a couple of kids, and that he felt -- he wasn't able to get a job and hold a job -- and he felt that he was putting a lot of financial stresses on her. And he also said, you know, he, himself, got a little stressed about it and was having a lot of trouble adjusting and he slipped and started using his cocaine again.

And he said he went into the Admiral gas station. He told me that he walked in there to the clerk, asked the clerk for some cigarettes. The clerk turned around to get cigarettes. As the clerk turned around -- he actually showed me what he did -- he leaned forward like this onto the counter and told the guy in a low voice to -- told him to give him the money and he wouldn't get hurt, and then he said the guy gave him the money and he left.

Relevant here, the meeting between Evans and defendant took place in the jail library and lasted approximately 15 to 25 minutes. Evans did not inform defendant of his *Miranda* rights or tell defendant that he was not required to speak to her absent a lawyer being present. According to Evans, during the meeting, defendant told her that he had submitted a letter indicating that he wished to talk to the police again, and at the end of the meeting, defendant asked Evans to convey to the police that he wished to speak to them.

Defendant was eventually charged with armed robbery for the gas station incident, and he was tried before a jury. At the beginning of trial, defendant moved to suppress Evans's testimony regarding defendant's confession, arguing that it was improperly obtained because defendant had not been informed of his *Miranda* rights and because defendant had previously requested counsel. After conducting a hearing, the trial court determined that Evans had not been acting in concert with law enforcement officials and

5

that Evans was not herself a law enforcement officer obligated to give *Miranda* warnings. Accordingly, the court denied defendant's motion and admitted Evans's testimony regarding defendant's confession. The jury convicted defendant of armed robbery, and he was sentenced as a fourth-offense habitual offender to a prison term of 15-30 years.

Defendant appealed, arguing that the trial court had erred when it denied his motion to suppress Evans's testimony regarding his confession and that the error was not harmless. In a published opinion, the Court of Appeals held that a parole officer is a law enforcement officer for purposes of *Miranda*, that defendant was in custody when Evans interrogated him, and that the statements made by defendant were thus "inadmissible in a subsequent trial [because] the parolee invoked the right to counsel before questioning." *People v Elliott*, 295 Mich App 623, 646; 815 NW2d 575 (2012). The Court of Appeals agreed with defendant that the trial court's error in denying the motion to suppress was not harmless given the significance the prosecutor had placed on Evans's testimony. *Id.* at 647-648. The Court of Appeals reversed defendant's conviction and remanded for a new trial. *Id.* at 626. We granted the prosecutor's application for leave to appeal. *People v Elliott*, 491 Mich 938 (2012).[3]

---

[3] The Court of Appeals also held that the trial court did not clearly err by finding that Evans had not acted in concert with, or at the request of, the police. *Elliott*, 295 Mich App at 636. Defendant does not appeal that holding. Thus, our order granting the prosecutor's application stated as follows:

> The parties shall address whether, and, in light of *Howes v Fields*, 565 US ___; 132 S Ct 1181; 182 L Ed 2d 17 (2012), under what custodial circumstances, a parole officer not acting in concert with police is required to provide the warnings prescribed by *Miranda v Arizona*, 384 US 436; 86

6

## II. STANDARD OF REVIEW

"We review a trial court's factual findings in a ruling on a motion to suppress for clear error. To the extent that a trial court's ruling on a motion to suppress involves an interpretation of the law or the application of a constitutional standard to uncontested facts, our review is de novo." *People v Attebury*, 463 Mich 662, 668; 624 NW2d 912 (2001). Whether a court applied the correct constitutional standard is reviewed de novo. *People v McRae*, 469 Mich 704, 710; 678 NW2d 425 (2004).

## III. ANALYSIS

In *Miranda*, the United States Supreme Court held that the Fifth Amendment's prohibition against compelled self-incrimination requires that the accused be given a series of warnings before being subjected to "custodial interrogation."[4] *Miranda*, 384 US at 444 ("Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."). The right to

---

S Ct 1602; 16 L Ed 2d 694 (1966), before questioning an in-custody parolee who, during police questioning, has previously invoked his right to counsel under *Edwards v Arizona*, 451 US 477; 101 S Ct 1880; 68 L Ed 2d 378 (1981), about an offense giving rise to an alleged parole violation, if the parole officer's testimony concerning the parolee's responses to such questioning is to be admissible at the trial for that offense. [*Elliott*, 491 Mich 938.]

[4] The United States Constitution and the Michigan Constitution both prohibit "compelled" self-incrimination. US Const, Am V ("No person shall . . . be compelled in any criminal case to be a witness against himself . . . ."); Const 1963, art 1, § 17 ("No person shall be compelled in any criminal case to be a witness against himself . . . .").

have counsel present during custodial interrogation is a corollary of the right against compelled self-incrimination, because the presence of counsel at custodial interrogation is one way in which to "insure that statements made in the government-established atmosphere are not the product of compulsion." *Id.* at 466; see also *id.* at 470. If the custodial interrogation is not preceded by an adequate warning, statements made during the custodial interrogation may not be introduced into evidence at the accused's criminal trial. *Id.* at 444-445.

The prosecutor concedes that *Miranda* warnings were not given by the parole officer. Thus, the pertinent question is whether the meeting with the parole officer that resulted in defendant's inculpatory statements constituted custodial interrogation. If the meeting did not constitute custodial interrogation, the ruling of the trial court was correct and the statements were properly admitted into evidence. See *People v Hill*, 429 Mich 382, 397; 415 NW2d 193 (1987) (indicating that *Miranda* warnings are not required unless the accused is subject to custodial interrogation). On the other hand, if the meeting did constitute custodial interrogation, the ruling of the trial court was in error and the statements were improperly admitted into evidence.

There is no dispute that defendant invoked his right to have counsel present during custodial interrogation when he was questioned on June 18 by Jackson police detectives about the gas station robbery and that the invocation triggered certain safeguards pursuant to *Edwards*, 451 US at 484-485. In *Edwards*, the United States Supreme Court created "additional safeguards" for when the accused invokes his right to have counsel present during custodial interrogation:

> [W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. . . . [H]aving expressed his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police. [*Edwards*, 451 US at 484-485.]

*Edwards* concerns only the manner in which the accused, after invoking his right to have counsel present during custodial interrogation, can validly waive that right and thereafter be subjected to further custodial interrogation absent counsel.[5] If the accused is never subjected to custodial interrogation after he has invoked his right to counsel, *Edwards* is inapplicable. In other words, according to *Edwards*, the right the accused invokes under *Miranda* is the right to have counsel present during custodial interrogation. *Edwards*, 451 US at 485-486 ("The Fifth Amendment right identified in *Miranda* is the right to have counsel present at any custodial interrogation."). In the absence of a post-invocation custodial interrogation, there can be no infringement of that right. See, e.g., *Maryland v Shatzer*, 559 US 98, 111; 130 S Ct 1213; 175 L Ed 2d 1045 (2010) ("In every

---

[5] The prosecutor does not argue that defendant validly waived the right to have counsel present during custodial interrogation. Rather, he simply argues that defendant did not have the right to have counsel present during his meeting with Evans. Because we agree, we also do not address waiver in this opinion. That is, unlike the dissenting opinion, we conclude that because the parole officer did not subject defendant to custodial interrogation, defendant had no right to counsel during his meeting with the parole officer. Because we conclude that defendant had no right to counsel to waive, we do not need to address the concurring opinion's conclusion that defendant waived that right. The dissenting opinion would broaden the concept of custodial interrogation and thereby ensure that in some unknown number of future cases, voluntary confessions such as that which occurred in this very case, would be rendered inadmissible.

9

case involving *Edwards*, the courts must determine whether the suspect was in custody when he requested counsel *and when he later made the statements he seeks to suppress.*"); *Edwards*, 451 US at 487 ("We think it is clear that Edwards was subjected to custodial interrogation [at a second meeting with the police] . . . and that this occurred at the instance of the authorities.").

The pertinent question in this case is not, as the Court of Appeals believed it to be, "whether Evans was a law enforcement officer under *Miranda* as a matter of law given her status as a parole officer . . . ." *Elliot*, 295 Mich App at 636. Although *Miranda* discussed the constitutional safeguards in terms of "questioning initiated by law enforcement officers," *Miranda*, 384 US at 444, neither *Miranda*'s right to be given a series of warnings nor *Edwards*'s right to have counsel present apply absent custodial interrogation, regardless of whether a parole officer constitutes a law enforcement officer. Thus, to determine whether a defendant's *Miranda* or *Edwards* rights have been violated, we must first resolve whether the meeting with the parole officer constituted custodial interrogation.[6] Because we conclude that defendant was not subjected to custodial

---

[6] Although we agree with the dissent that defendant "could not be subjected to further *custodial interrogation* about the robbery until counsel had been made available to him or he initiated communication," *post* at 2 (emphasis added), we disagree that "Evans's interview of defendant about the robbery [cannot] be viewed as noncustodial because custody, for purposes of *Miranda* and *Edwards*, was not broken between the initial interrogation by the police and Evans's subsequent questioning three days later," *post* at 3. For all of the reasons set forth in this opinion, we believe that defendant's meeting with the parole officer cannot be viewed as the same as his meeting with the police in terms of constituting "custodial interrogation." Further, however, we believe it is clear that these constituted entirely distinct episodes, distinct in terms of when they occurred, distinct in terms of their participants, distinct in terms of who was doing the interrogation,

10

interrogation by the parole officer, we need not further consider whether a parole officer not acting in concert with or at the request of the police may be considered a law enforcement officer for purposes of *Miranda*. By focusing on the wrong constitutional question, the Court of Appeals considerably expanded the domain of *Miranda*, particularly with regard to parole officers.

## A. "CUSTODIAL INTERROGATION"

In *Miranda*, the United States Supreme Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id*. Custodial interrogation occurs "during 'incommunicado interrogation of individuals in a police-dominated atmosphere.'" *Illinois v Perkins*, 496 US 292, 296; 110 S Ct 2394; 110 L Ed 2d 243 (1990), quoting *Miranda*, 384 US at 445. "That atmosphere is said to

---

distinct in terms of their venue, distinct in terms of their subject matter and purpose, distinct in terms of their coercive aspects, and distinct in terms of the overall environment in which they took place. That *one* of these episodes can be characterized as involving custodial interrogation carries no particular significance in terms of whether the *other* can be similarly characterized, as it must be, before defendant's *Miranda* rights are implicated. Although, by treating these distinct episodes as part of a "continuing" sequence of events that "never ceased" the dissent can impute the attributes of one meeting to the other meeting, we do not believe this accurately describes the relationship between the events. Indeed, the dissent itself acknowledges that the police "stopped questioning" defendant when he invoked his right to have counsel present, and the dissent identifies no reason why the custodial interrogation that existed during the meeting with the police should necessarily be thought to carry over to the meeting with the parole officer. The only relevant question under *Edwards* is whether the *meeting with the parole officer* did or did not constitute custodial interrogation, and we believe that it did not.

11

generate 'inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.'" *Perkins*, 496 US at 296, quoting *Miranda*, 384 US at 467. "'Fidelity to the doctrine announced in *Miranda* requires that it be enforced . . . only in those types of situations in which the concerns that powered the decision are implicated.'" *Perkins*, 496 US at 296, quoting *Berkemer v McCarty*, 468 US 420, 437; 104 S Ct 3138; 82 L Ed 2d 317 (1984).

Where, as here, a parolee is incarcerated for an alleged parole violation, "custodial" means more than just the normal restrictions that exist as a result of the incarceration. Indeed, the United States Supreme Court has held that "imprisonment alone is not enough to create a custodial situation within the meaning of *Miranda*." *Howes v Fields*, 565 US __, __; 132 S Ct 1181, 1190; 182 L Ed 2d 17 (2012); see also *Shatzer*, 559 US at 112-113. Instead, whether "incarceration constitutes custody for *Miranda* purposes . . . depends upon whether it exerts the coercive pressure that *Miranda* was designed to guard against—the 'danger of coercion [that] results from the *interaction* of custody and official interrogation.'" *Shatzer*, 559 US at 112 (emphasis and alteration in original), quoting *Perkins*, 496 US at 297. In determining whether defendant was presented with the same inherently coercive pressures that were the basis for the decision in *Miranda*, we find *Fields* instructive.

In *Fields*, a Michigan prisoner, Randall Fields, was escorted from his prison cell by a corrections officer to a conference room in which he was questioned by two sheriff's deputies about criminal activity he had allegedly engaged in before coming to prison. Fields was questioned for between five and seven hours and was at no time given

12

*Miranda* warnings or advised that he did not have to speak with the deputies. Fields was told more than once that he was free to leave and return to his cell. The deputies were armed, but Fields remained free of restraints. The conference room door was sometimes open and sometimes shut. Several times during the interview Fields stated that he no longer wanted to talk to the deputies, but he did not ask to go back to his cell. After Fields eventually confessed and the interview concluded, he had to wait an additional 20 minutes for an escort before returning to his cell well after the time when he generally went to bed.

Under these facts, the United States Supreme Court held that Fields was not in custody for purposes of *Miranda*, and set forth the following constitutional standards:

> As used in our *Miranda* case law, "custody" is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of "the objective circumstances of the interrogation," a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." And in order to determine how a suspect would have "gauge[d]" his "freedom of movement," courts must examine "all of the circumstances surrounding the interrogation." Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning.

> Determining whether an individual's freedom of movement was curtailed, however, is simply the first step in the analysis, not the last. Not all restraints on freedom of movement amount to custody for purposes of *Miranda*. We have "decline[d] to accord talismanic power" to the freedom-of-movement inquiry, and have instead asked the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*. "Our cases make clear . . . that the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody."

13

* * *

> When a prisoner is questioned, the determination of custody should focus on all of the features of the interrogation. These include the language that is used in summoning the prisoner to the interview and the manner in which the interrogation is conducted. [*Fields*, 565 US at __; 132 S Ct at 1189-1190, 1192 (citations omitted; alterations in original).]

The Court then held that questioning a person in prison does not generally "involve the shock that very often accompanies arrest," that "when a prisoner is questioned, he knows that when the questioning ceases, he will remain under confinement," that a prisoner "is unlikely to be lured into speaking by a longing for prompt release," and that a prisoner knows his questioners "probably lack the authority to affect the duration of his sentence." *Id.* at __; 132 S Ct at 1190-1191. The Court found it "important" that Fields "was told at the outset of the interrogation, and was reminded again thereafter, that he could leave and go back to his cell whenever he wanted." *Id*. at __; 132 S Ct at 1193. However, it also noted that Fields "was not advised that he was free to decline to speak with the deputies." *Id*. at __; 132 S Ct at 1193. Despite this failing, the Court held that Fields was not in custody for purposes of *Miranda*.

Pursuant to *Fields*, the first constitutional step is to determine "whether an individual's freedom of movement was curtailed . . . ." *Fields*, 565 US at __; 132 S Ct at 1189. If so, the court should then ask "the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.* at __; 132 S Ct at 1190. Thus, "[n]ot all restraints on freedom of movement amount to custody for purposes of *Miranda*." *Id.* at __; 132 S Ct at 1189.

14

In the instant case, the meeting at issue took place in the jail library, it was of short duration (15 to 25 minutes), defendant was not physically restrained, and he was escorted to the library by a deputy, not by the parole officer. We note, as does the dissent, that one difference between this case and *Fields* is that defendant in this case was never told that he was free to leave the meeting and return to his cell. However, given that the meeting in this case lasted approximately 15 to 25 minutes, and the one in *Fields* lasted for five to seven hours, we do not think this fact is particularly compelling, much less dispositive, under the circumstances.[7] More significant is the fact that defendant was not free to leave the jail library by himself. In this respect, this situation resembles that of the defendant in *Fields*:

> Because he was in prison, respondent was not free to leave the conference room by himself and to make his own way through the facility to his cell. Instead, he was escorted to the conference room and, when he ultimately decided to end the interview, he had to wait about 20 minutes for

---

[7] See *Stansbury v California*, 511 US 318, 322; 114 S Ct 1526; 128 L Ed 2d 293 (1994) ("In determining whether an individual was in custody, a court must examine *all of the circumstances* surrounding the interrogation . . . .") (emphasis added). The dissent states that "the *Fields* majority cited the fact that the defendant in that case was told he was free to leave as the '[m]ost important' factor in its determination that the defendant was not in custody." *Post* at 6 (alteration in original). More precisely, however, the Court found this fact to be the "most important" only in "offset[ting]" the facts that *supported* the "argument that *Miranda*'s custody requirement was met: The interview lasted for between five and seven hours in the evening and continued well past the hour when respondent generally went to bed; the deputies who questioned respondent were armed; and one of the deputies, according to respondent, '[u]sed a very sharp tone' . . . ." *Fields*, 565 US at __; 132 S Ct at 1193 (alteration in original). As defendant in this case was not interviewed for five to seven hours late into the night by armed deputies who used a sharp tone, it is of considerably less relevance that the parole officer did not apprise defendant that he was free to return to his cell, because no such similarly harsh circumstances *existed* in the first place that needed to be "offset" by this fact.

15

a corrections officer to arrive and escort him to his cell. *But he would have been subject to this same restraint even if he had been taken to the conference room for some reason other than police questioning; under no circumstances could he have reasonably expected to be able to roam free.* [*Id.* at __; 132 S Ct at 1193 (emphasis added).]

Moreover, much like the prisoner in *Fields*, a "reasonable person" in defendant's "position," i.e., a *parolee*,[8] would be aware that a parole officer is acting independently of the police who placed him in custody and has no control over the jail, its staff, or the individuals incarcerated there.[9] Thus, on balance, we conclude that defendant's "freedom of movement" was not "curtailed" during the meeting at the jail library. *Id.* at __; 132 S

---

[8] *Berkemer v McCarty*, 468 US 420, 442; 104 S Ct 3138; 82 L Ed 2d 317 (1984) ("[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation."); *Yarborough v Alvarado*, 541 US 652, 663; 124 S Ct 2140; 158 L Ed 2d 938 (2004) ("Courts must examine 'all of the circumstances surrounding the interrogation' and determine 'how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action.'"). Relevantly, the suspect in *Yarborough* was also not told "that he was free to leave." *Id*. at 655.

[9] *Fields*, 565 US at ___; 132 S Ct at 1191 (2012), quoting *Perkins*, 496 US at 297 ("'When the suspect has no reason to think that the listeners have official power over him, it should not be assumed that his words are motivated by the reaction he expects from his listeners.'"). See also, In *JDB v North Carolina*, ___ US ___, ___; 131 S Ct 2394, 2404, 2406; 180 L Ed 2d 310 (2011) (stating that "so long as the child's age was known to the officer at the time of police questioning . . . its inclusion in the custody analysis is consistent with the objective nature of [the *Miranda* custody] test" because "a child's age differs from other personal characteristics that . . . have no objectively discernible relationship to a reasonable person's understanding of his freedom of action"). *JDB* thus distinguished age from a suspect's "prior *interrogation history* with law enforcement," noting that the latter could not be considered without compromising the objective nature of the custody analysis because the effect of this experience is contingent on the psychology of the individual suspect. *Id.* at ___; 131 S Ct at 2404. We do not think it is an unreasonable or "subjective" conclusion that a parolee is more generally aware, precisely because he or she is a parolee, that a parole officer acts independently of the police and has no control over the jail, its staff, or the individuals incarcerated there.

16

Ct at 1189.[10] The facts are consistent with an "'environment in which a reasonable person would have felt free to terminate the interview and leave.'" *Id.* at __; 132 S Ct at 1193, quoting *Yarborough v Alvarado*, 541 US 652, 664-665; 124 S Ct 2140; 158 L Ed 2d 938 (2004).

Even if defendant could show that his freedom of movement was somehow curtailed during the meeting, he still fails to explain how the meeting "present[ed] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Fields*, 565 US at __; 132 S Ct at 1189-1190 ("[W]hether an individual's freedom of movement was curtailed, however, is simply the first step in the analysis, not the last. . . . We have 'decline[d] to accord talismanic power' to the freedom-of-movement inquiry, and have instead asked the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*.") (citation omitted; second alteration in original). See also *United States v Salyers*, 160 F3d 1152, 1159 (CA 7, 1998) ("Custody 'implies a situation in which the suspect knows he is speaking with a government agent and does not feel free to end the conversation; *the essential element of a custodial interrogation is*

---

[10] The dissent, *post* at 8 n 17, errs in its suggestion that *Fields* did not discuss defendant's status as an inmate in the "freedom of movement" inquiry in that case. See *Fields*, 565 US at ___; 130 S Ct at 1193 (stating that because the respondent was in prison "under no circumstances could he have reasonably expected to be able to roam free"). We believe that defendant's "parolee status" is similarly relevant. See also, *Shatzer*, 559 US at 107-108.

*coercion.*'"), quoting *United States v Martin*, 63 F3d 1422, 1429 (CA 7, 1995) (emphasis added).

In this case, there is no evidence of coercion or any other manner of psychological intimidation. The parole officer visited defendant as part of her job as a parole officer; her only reasons for speaking to defendant were to advise him of parole violation charges,[11] advise him of his right to a preliminary hearing on those charges,[12] and to see if he was prepared to waive his right to a preliminary hearing. The officer was required to do all of this as part of her job, regardless of whether defendant was in or out of jail. Defendant cannot show inherently coercive pressures that caused him to discuss the robbery with the parole officer. Defendant was in jail for other parole violation charges (absconding) that were unrelated to the charges Evans was there to serve. Also, unlike in *Fields*, defendant was not questioned for an extended period of time by *armed* police officers who used a "'sharp tone'" and "profanity." *Fields*, 565 US at __; 132 S Ct at 1193 (citation omitted). And also unlike in *Fields*, in which the defendant indicated on several occasions during the interview that he did not want to talk to the police officers, defendant in this case did not even once indicate that he did not want to talk to the parole officer. Nor is there any evidence that the meeting "continued well past the hour" when

---

[11] See MCL 791.239a(2) ("Prior to the preliminary hearing, the accused parolee shall be given written notice of the charges . . . .")

[12] See MCL 791.239a(1) ("Within 10 days after an arrest for an alleged violation of parole, the parolee shall be entitled to a preliminary hearing to determine whether there is probable cause to believe that the conditions of parole have been violated or a fact-finding hearing held pursuant to [MCL 791.240a].")

18

defendant "generally went to bed," *id*. at __; 132 S Ct at 1193, that the officer had the authority to alter the duration of defendant's incarceration,[13] or that defendant could not terminate the meeting. This situation does not represent custodial interrogation because defendant was not subjected to the type of coercive pressure against which *Miranda* was designed to guard. It is hardly the sort of incommunicado, police-dominated atmosphere involving custodial interrogation and the "overbearing" of the subject's will toward which *Miranda* was directed. Accordingly, in our judgment, there was no "custodial interrogation" as that term has come to be understood under *Miranda* and its progeny.

The dissent argues that *Fields* and *Shatzer* (another opinion that held that imprisonment alone is insufficient to create a custodial interrogation situation within the meaning of *Miranda*) are significantly distinguishable from the instant case because the defendants in those cases "were both serving sentences for unrelated crimes and living in the prison in which they were interviewed." *Post* at 4. However, the dissent fails to recognize that a parolee who is incarcerated as a result of violating a condition of his

---

[13] Contrary to the dissent's suggestion, the mere fact that Evans, who was not even defendant's supervising parole officer, "was present at the jail to serve parole violation charges on defendant" does not mean that Evans had the "'authority to affect the duration of his sentence . . . .'" *Post* at 9, quoting *Fields*, 565 US at ___; 132 S Ct at 1191. As explained in *Fields*, 565 US at ___; 132 S Ct at 1191, "a prisoner, unlike a person who has *not* been convicted and sentenced, knows that the law enforcement officers who question him probably lack the authority to affect the duration of his sentence." (Emphasis added.) Also, the dissent offers no factual support for its assertion that "Evan's influence [c]ould have been critical" regarding "how much time defendant served . . . ." *Post* at 9 n 21. Instead, it appears that Evans merely filled in for defendant's supervising parole officer and completed the single discrete task of serving defendant with an amended notice of parole violations, and that defendant's supervising parole officer was the one ultimately responsible for overseeing his parole violation.

parole is at that juncture no different than a prisoner who was never paroled in the first place, at least in the sense that both are imprisoned as a result of their underlying offenses. Defendant here was arrested by the police pursuant to a warrant that was issued because he had absconded from parole. Because defendant was on parole and a warrant for his return had been issued as a result of his violation of a condition of parole, defendant, pursuant to Michigan law, could not be considered anything other than a "prisoner," as were the defendants in *Fields* and *Shatzer*. *People v Holder*, 483 Mich 168, 172-173; 767 NW2d 423 (2009) ("A paroled prisoner is not considered released; rather, the prisoner is simply permitted to leave the confinement of prison."); MCL 791.238(1) ("Each prisoner on parole shall remain in the legal custody and under the control of the department."); MCL 791.238(2) ("A prisoner violating the provisions of his or her parole and for whose return a warrant has been issued by the deputy director of the bureau of field services is treated as an escaped prisoner . . . ."). Therefore, we do not agree that *Fields* and *Shatzer* are distinguishable, much less "significantly" so, on this basis.

In viewing the totality of circumstances in *Fields* and in the present case, we believe that if there was no custodial interrogation in the *Miranda* sense in *Fields*, there was certainly no custodial interrogation in the instant case. In *Fields*, the defendant was questioned by armed police officers; here, defendant was questioned, if you can even call it that, by an unarmed parole officer. In *Fields*, the defendant was questioned by armed police officers who were trying to obtain a confession from the defendant; here, defendant met with an unarmed parole officer who was there for the principal purpose of

20

serving defendant with an amended notice of parole violations. In *Fields*, the defendant was questioned by armed police officers for about 5 to 7 hours; here, defendant met with an unarmed parole officer for 15 to 25 minutes. In *Fields*, the armed police officers used a "sharp tone" and "profanity" while questioning the defendant for several hours; here, the unarmed parole officer was altogether cordial and sympathetic with defendant during their brief meeting. In *Fields*, the armed police officers continued to question the defendant until well past his regular bedtime; here, the unarmed parole officer did not keep defendant up late at night. In *Fields*, the defendant repeatedly stated that he did not want to talk to the armed police officers; here, defendant never indicated in any manner that he did not wish to talk to the unarmed parole officer. We believe it is clear that the totality of circumstances in *Fields* far more closely resembles the kind of custodial interrogation that generated the extraordinary protections of *Miranda* than does the totality of circumstances in the present case-- yet even in *Fields*, such circumstances were viewed by the United States Supreme Court to be insufficient to trigger the requirements of *Miranda*.

Moreover, the "inherently coercive" attributes of the parolee/parole officer relationship that the Court of Appeals relied on in reaching its conclusions are wholly inapplicable here because Evans *was not defendant's supervising officer*. The Court of Appeals explained:

> The rationale for the suppression of statements elicited during a custodial interrogation by a law enforcement officer who does not adhere to *Miranda* is to "combat" the "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda*, 384 US at 467; see

also [*People v*] *Williams*, 244 Mich App [533, 539; 624 NW2d 575 (2001)]. Such "inherently compelling pressures" exist in the relationship between a parolee and a parole officer. Indeed, this Court has recognized that "both parolees and probationers are under heavy psychological pressure to answer inquiries made by their supervising officers." *People v Faulkner*, 90 Mich App 520, 524; 282 NW2d 377 (1979) (quotation marks and citations omitted). This heavy psychological pressure exists because of the unique relationship between a parolee and parole officer.

> . . . [T]he parolee-parole officer relationship often becomes a relationship of trust and confidence, as does the probationer-probation officer relationship addressed by Justice Marshall in *Murphy*. See *Murphy*, 465 US at 459–460 (Marshall, J., dissenting). As a parolee develops trust and begins to confide in a parole officer, the parole officer is more likely to elicit from the parolee incriminating statements that the parolee would likely not make to a police interrogator. [*Elliot*, 295 Mich App at 643.]

However, the Court of Appeals failed to recognize that the parole officer in the instant case was not *defendant's* parole officer and thus that they did not have the kind of "unique relationship" of "trust and confidence" that the Court of Appeals assumed that they did.[14] Indeed, much, if not all, of the persuasive authority cited by the Court of Appeals seems inapposite when someone *other* than the defendant's supervising parole officer is conducting the meeting.[15]

---

[14] Even if, as the dissent asserts, defendant and Evans had developed a "unique relationship" of "trust and confidence" that created some "psychological pressure" on defendant to answer Evans's inquires, this would not necessarily have converted defendant's otherwise voluntary statements into compelled ones.

[15] See, e.g., *Elliott*, 295 Mich App at 642-643, citing *Murphy*, 465 US at 459-460 (Marshall, J., dissenting).

## B. *MINNESOTA v MURPHY*

In *Minnesota v Murphy*, 465 US 420; 104 S Ct 1136; 79 L Ed 2d 409 (1984), the respondent was given a suspended prison sentence and placed on probation. During the course of a meeting at his probation officer's office, the respondent, upon questioning by his probation officer, admitted that he had committed a rape and murder in 1974. The probation officer had previously received information from a treatment counselor that respondent had admitted to the 1974 crimes.

The respondent moved to suppress the confession, but the trial court found that he had not been in custody at the time of the confession and that the confession was neither compelled nor involuntary despite the absence of *Miranda* warnings. The Minnesota Supreme Court reversed, holding that the respondent's

> failure to claim the privilege when he was questioned was not fatal to his claim "[b]ecause of the compulsory nature of the meeting, because [the respondent] was under court order to respond truthfully to his agent's questions, and because the agent had substantial reason to believe that [the respondent's] answers were likely to be incriminating." [*Murphy*, 465 US at 425, quoting *State v Murphy*, 324 NW2d 340, 344 (Minn, 1982) (first alteration in original).]

The United States Supreme Court reversed, holding that *Miranda* warnings are not necessary during the course of a routine probation interview, even when there is a connection between the probation officer-interviewer and the criminal investigative process. The Court rejected the proposition that the fact that the probation officer was consciously seeking incriminating evidence was relevant. *Murphy*, 465 US at 431 ("[T]he probation officer's knowledge and intent have no bearing on the outcome of this

23

case."). The Court also rejected the argument that the respondent might have reasonably expected that his statements to the probation officer would remain confidential:

> [W]e cannot conclude that [the probation officer's] actions would have led a reasonable probationer to believe that his statements to her would remain confidential. A probationer cannot pretend ignorance of the fact that his probation officer "is a peace officer, and as such is allied, to a greater or lesser extent, with his fellow peace officers." . . . The fact that [the respondent] apparently expressed no surprise on being informed that his statements would be made available to the police, moreover, strongly suggests that he was not misled by any expectation that his statements would remain confidential. [*Id.* at 432.]

Finally, the Court held that

> the coercion inherent in custodial interrogation derives in large measure from an interrogator's insinuations that the interrogation will continue until a confession is obtained. Since [the respondent] was not physically restrained and could have left the office, any compulsion he might have felt from the possibility that terminating the meeting would have led to revocation of probation was not comparable to the pressure on a suspect who is painfully aware that he literally cannot escape a persistent custodial interrogator. [*Id.* at 433 (citation omitted).][16]

Some courts have noted that a parole officer's questioning can be inherently more coercive than a law enforcement officer's questioning because the parole officer can put the parolee in prison more easily than can a police officer.[17] However, whatever the

---

[16] The Court further noted that the rule in *Miranda* was crafted to apply to a situation that "thrusts an individual into 'an unfamiliar atmosphere' or 'interrogation environment . . . created for no purpose other than to subjugate the individual to the will of his examiner.'" *Murphy*, 465 US at 433, quoting *Miranda*, 384 US at 457. The situation is one that "is said to convey to the suspect a message that he has no choice but to submit to the officers' will and to confess." *Murphy*, 465 US at 433.

[17] See 2 LaFave, Criminal Procedure (3d ed), § 6.10(c), p 878 ("[S]ome courts have reached [the conclusion] that custodial interrogation (other than routine interviews) by a probation or parole officer is governed by *Miranda* because the probationer or parolee is

merits of this analysis, this concern does not exist to the same extent once the accused is *already* in jail for a parole violation because the primary source of the parole officer's potential for coercion no longer exists. In this sense, a meeting *after* the accused has been arrested for violating his parole presents a less threatening situation than one conducted by a parole or probation officer before the accused has been arrested. In this case, defendant had already been given notice that his parole was being revoked and that he was in jail for that reason. Thus, no parole officer could threaten to put him in jail; he was already there. Moreover, this was not *his* parole officer. Defendant could not reasonably be under any illusions that Evans would have possessed any power to immediately free *or* detain him when he was not even her charge. As was the case in *Murphy*, there "is no direct evidence that [defendant] confessed because he feared that his probation would be revoked if he remained silent." *Id.* at 437. Similarly, defendant's request at the end of the meeting that the parole officer convey to the police that he wished to speak to them "strongly suggests that he was not misled by any expectation that his statements would remain confidential." *Id.* at 432.

---

under 'heavy psychological pressure to cooperate' with one who can recommend his imprisonment.") (citations omitted); *State v Gallagher*, 46 Ohio St 2d 225, 227; 348 NE2d 336 (1976) ("[A] parolee is under heavy pressure to cooperate with his parole officer * * * (who, allegedly,) had the power to recommend the return to prison of a parolee under his charge . . . .") (citation and quotation marks omitted).

## C. *ESTELLE v SMITH*

Unlike the dissent, we disagree that *Estelle v Smith*, 451 US 454; 101 S Ct 1866; 68 L Ed 2d 359 (1981), is particularly "instructive" with regard to the question at issue here-- custody. *Post* at 10. Indeed, *Estelle* did not even address that issue. Instead, *Estelle* simply assumed that the respondent in that case was in custody for *Miranda* purposes because he "was in custody at the Dallas County Jail when the examination was ordered and when it was conducted." *Id.* at 467. Moreover, since *Estelle* was decided, the Court has affirmatively held that prisoners are not invariably in custody for purposes of *Miranda*. See *Fields*, 565 US at ___; 132 S Ct at 1190. Because *Estelle* predated *Fields* and thus did not engage in the analysis that *Fields* now requires in determining whether an accused/prisoner was in custody for *Miranda* purposes, we do not believe that *Estelle* is relevant with regard to whether defendant was in custody for *Miranda* purposes, which the dissent agrees is the controlling issue.[18]

Moreover, *Estelle* is also significantly distinguishable because it involved a court-ordered psychiatric examination. In *Estelle*, the Court held that the admission of a

---

[18] The dissent cites *Estelle* for the proposition that somebody other than a police officer, such as a psychiatrist who performs a court-ordered psychiatric examination, can conduct a custodial interrogation for purposes of *Miranda*. We do not necessarily disagree with this proposition. However, as both this and the dissenting opinions recognize, "the dispositive issue is whether defendant was subject to custodial interrogation, not the nature of the relationship between the questioner and defendant." *Post* at 1. Because we conclude that defendant was not subjected to a custodial interrogation for *Miranda* purposes, it is wholly unnecessary to address whether a parole officer is a law enforcement officer for *Miranda* purposes. *Infra* at 10-11.

psychiatrist's testimony to establish an element of proof necessary to support the imposition of capital punishment violated the respondent's Fifth Amendment privilege against compelled self-incrimination. The psychiatrist's testimony related to a 90-minute pretrial competency examination that the psychiatrist had administered to the respondent.[19] The Court emphasized that the competency examination "was ordered even though defense counsel had not put into issue [the respondent's] competency to stand trial or his sanity at the time of the offense," *Estelle*, 451 US at 457 n 1, and that this was a "compulsory examination," to which the respondent was "compelled to respond," yet "he was given no indication that the compulsory examination would be used to gather evidence necessary to decide whether, if convicted, he should be sentenced to death," *id.* at 467-468. The Court summarized:

> To meet its burden, the State used respondent's own statements, unwittingly made without an awareness that he was assisting the State's efforts to obtain the death penalty. In these distinct circumstances, the

---

[19] The Court explained the circumstances of the examination and how those circumstances implicated the Fifth Amendment:

> The fact that respondent's statements were uttered in the context of a psychiatric examination does not automatically remove them from the reach of the Fifth Amendment. The state trial judge, *sua sponte*, ordered a psychiatric evaluation of respondent for the limited, neutral purpose of determining his competency to stand trial, but the results of that inquiry were used by the State for a much broader objective that was plainly adverse to respondent. Consequently, the interview with Dr. Grigson cannot be characterized as a routine competency examination restricted to ensuring that respondent understood the charges against him and was capable of assisting in his defense. Indeed, if the application of Dr. Grigson's findings had been confined to serving that function, no Fifth Amendment issue would have arisen. [*Estelle*, 451 US at 465 (citation omitted).]

27

Court of Appeals correctly concluded that the Fifth Amendment privilege was implicated.

* * *

A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be *compelled to respond* to a psychiatrist if his statements can be used again him at a capital sentencing proceeding. . . .

. . . [U]nder *Miranda v Arizona*, we must conclude that, when faced while in custody with a *court-ordered psychiatric inquiry*, respondent's statements to Dr. Grigson were not "given freely and voluntarily without any compelling influences" and, as such, could be used as the State did at the penalty phase only if respondent had been apprised of his rights and had knowingly decided to waive them. [*Id.* at 466, 468 (citation omitted; emphasis added).]

Unlike what occurred in *Estelle*, there was no court-ordered "compulsory examination" to which defendant was "compelled to respond" in this case. As a result, *Estelle* is wholly inapplicable.[20]

---

[20] We also note that *Estelle* concerned the *Sixth Amendment* right to counsel, not the Fifth Amendment right to counsel:

Because psychiatric examinations of the type at issue here are conducted after adversary proceedings have been instituted, we are not concerned in this case with the limited right to the appointment and presence of counsel recognized as a Fifth Amendment safeguard in *Miranda*. See *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378. Rather, the issue before us is whether a defendant's Sixth Amendment right to the assistance of counsel is abridged when the defendant is not given prior opportunity to consult with counsel about his participation in the psychiatric examination. [*Estelle*, 451 US at 470 n 14 (citation omitted).]

## IV. CONCLUSION

Neither an accused's right under *Miranda* to be given a series of warnings nor an accused's right under *Edwards* to have counsel present apply absent custodial interrogation. Because defendant was not subjected to custodial interrogation by the parole officer, even if she was a law enforcement officer, neither of those rights were violated, and thus the trial court did not err by admitting defendant's confession. Accordingly, we reverse the judgment of the Court of Appeals and reinstate defendant's conviction and sentence.

Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
David F. Viviano

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellant,

v                              No. 144983

SAMUEL LEE ELLIOTT,

       Defendant-Appellee.

_____

YOUNG, C.J. (*concurring*).

     I concur in the majority's decision to reverse the judgment of the Court of Appeals and reinstate defendant's conviction and sentence. Even if parole officer Cheryl Evans's interrogation of defendant was a custodial interrogation by a law enforcement officer, the facts here indicate that defendant waived any right to have counsel present during this interrogation.[1] As a result, I believe that the question whether defendant's interrogation was custodial for *Miranda* purposes is immaterial to the result in this case.

     Evans testified at trial that defendant had submitted a letter to police indicating that he wanted to talk with them again and that defendant had reiterated that request when

_____

[1] The parties have not argued the waiver issue. However, we generally do not disturb a trial court's ruling when it reaches the right result for the wrong reason. See, e.g., *People v Brownridge*, 459 Mich 456, 462; 591 NW2d 26 (1999). Moreover, in this case, every member of the Court agrees that the relevant issue in this case is not—as the trial court and Court of Appeals ruled and the parties argued—whether Evans acted as a "law enforcement officer" pursuant to *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

talking with her.[2]  Because defendant had already sought to discuss the case with the police at the time Evans questioned him about the robbery, he "initiate[d] further communication, exchanges, or conversations with the police."[3]  Furthermore, this initiation of communication with Evans (even assuming for the purposes of *Miranda* that she was a law enforcement officer) was knowing and intelligent.[4]  Initially, "defendant was properly advised of his rights and understood them . . . ."[5]  And his request at the end of the meeting that Evans reiterate to the police his desire to speak with them underscores that his waiver was knowing and intelligent.  Moreover, as the majority rightly notes, this request "'strongly suggests that he was not misled by any expectation that his statements [to her] would remain confidential.'"[6]  Therefore, as Evans did not violate defendant's Fifth Amendment rights, I concur that his conviction should be affirmed.

Robert P. Young, Jr.

---

[2] While Justice MCCORMACK would not rely on Evans's testimony, this testimony has not been challenged, much less rebutted.

[3] *Edwards v Arizona*, 451 US 477, 484-485; 101 S Ct 1880; 68 L Ed 2d 378 (1981). Even though defendant did not initiate the particular conversation with Evans, he nevertheless initiated communication with law enforcement officials and, in doing so, "evinced a willingness and a desire for a generalized discussion about the investigation . . . ." *Oregon v Bradshaw*, 462 US 1039, 1045-1046; 103 S Ct 2830; 77 L Ed 2d 405 (1983) (plurality opinion); *accord id.* at 1055 (Marshall, J., dissenting) ("[I]n order to constitute 'initiation' under *Edwards*, an accused's inquiry must demonstrate a desire to discuss the subject matter of the criminal investigation.").

[4] See *id*. at 1044-1045.

[5] *Id*. at 1046 (citation and quotation marks omitted).

[6] *Ante* at 25, quoting *Minnesota v Murphy*, 465 US 420, 432; 104 S Ct 1136; 79 L Ed 2d 409 (1984).

# STATE OF MICHIGAN

## SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellant,

v

No. 144983

SAMUEL LEE ELLIOTT,

      Defendant-Appellee.

_____

MCCORMACK, J. (*dissenting*).

I believe that the Court of Appeals correctly reversed defendant's conviction and remanded for a new trial. I would therefore affirm its judgment, although I agree with the majority that the dispositive issue is whether defendant was subject to custodial interrogation, not the nature of the relationship between the questioner and defendant. While the nature of the relationship between the questioner and the defendant may inform the determination of whether custodial interrogation occurred, it is not the lynchpin of the analysis. However, because I conclude in this case that defendant was subject to custodial interrogation by the parole officer, I disagree with the majority that his statements to her were admissible at trial. Accordingly, I respectfully dissent.

## I. APPLICATION

Because the majority correctly sets forth much of the applicable law and determines that custodial interrogation is the decisive issue, I turn right to the case at hand: Did the circumstances surrounding parole officer Cheryl Evans's questioning of

defendant amount to custodial interrogation, making his statements inadmissible at his later trial for the robbery because the interrogation violated *Miranda v Arizona*[1] and *Edwards v Arizona*,[2] in light of defendant's prior request for counsel? Unlike the majority, I conclude that the answer is yes.

## A. DEFENDANT'S INITIAL ARREST AND INTERROGATION

Like the parties, the majority does not dispute that the initial police interrogation concerning the robbery for which defendant was convicted constituted custodial interrogation to which *Miranda* applies.[3] Nor can that conclusion be seriously questioned. Defendant was arrested and taken to jail, depriving him of his freedom of movement, and he was subjected to the precise "station house questioning" by police officers that was found to be inherently coercive in *Miranda*.[4] The officers were thus obligated to, and did, give defendant *Miranda* warnings. Because *Miranda* applied, defendant's request for counsel triggered *Edwards*, and he could not be subjected to further custodial interrogation about the robbery until counsel had been made available to him or he initiated communication. The detectives honored his request, stopped questioning him, and according to Smith, even told Evans that defendant had invoked his right to counsel before she interviewed him.

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966) .

[2] *Edwards v Arizona*, 451 US 477; 101 S Ct 1880; 68 L Ed 2d 378 (1981).

[3] See *People v Elliott*, 295 Mich App  623, 633; 815 NW2d 575 (2012) ("[I]t is not disputed that defendant's June 18, 2010, police interrogation constituted a custodial interrogation under *Miranda*.").

[4] *Howes v Fields*, 565 US  ___, ___; 132 S Ct  1181, 1190; 182 L Ed 2d 17 (2012).

2

## B. DEFENDANT WAS SUBJECT TO CUSTODIAL INTERROGATION WHEN EVANS QUESTIONED HIM

This leaves one issue: whether Evans's questioning of defendant three days later violated *Edwards*. I disagree with the majority that Evans's interview of defendant about the robbery can be viewed as noncustodial because custody, for purposes of *Miranda* and *Edwards*, was not broken between the initial interrogation by the police and Evans's subsequent questioning three days later.

### 1. *EDWARDS*, NOT *FIELDS*, CONTROLS HERE

I conclude that Evans's interview with defendant violated *Edwards* because the custodial environment established at the initial police interview never ceased, and defendant did not initiate this conversation. The United States Supreme Court in *Maryland v Shatzer* described the "paradigm *Edwards* case" as one in which "the suspect has been arrested for a particular crime and is held in uninterrupted pretrial custody while that crime is being actively investigated."[5] While defendant was technically arrested for violating his parole, the custodial interrogation that immediately followed his arrest indisputably involved the gas station robbery. Thus, that defendant was not initially arrested for the robbery is of no moment. As in other paradigmatic *Edwards* cases described in *Shatzer*, defendant never "regained a sense of control or normalcy" after he was "initially taken into custody for the crime under investigation."[6] In this case, just as in *Edwards*, defendant made the inculpatory statements at issue three days after his initial

---

[5] *Maryland v Shatzer*, 559 US  98, 106; 130 S Ct 1213; 175 L Ed 2d 1045 (2010).

[6] *Id.* at 107.

police interview, during which everyone agrees he invoked his right to counsel while confined to the local jail.[7]

These facts stand in stark contrast to those of the defendants in *Shatzer* and *Fields*, who were both serving sentences for unrelated crimes and living in the prison in which they were interviewed. In those cases, the defendants were interviewed in their "accustomed surroundings," and when returned to the general prison population they simply resumed their "daily routine."[8] In this case, defendant did not live at the Jackson County Jail. The majority asserts that defendant "could not be considered anything other than a 'prisoner,' as were the defendants in *Fields* and *Shatzer*."[9] That argument is untenable given the similarities between this case and the paradigmatic *Edwards* case and the significant differences between this case and *Shatzer* and *Fields*. Defendant had not been placed back into his "normal" correctional facility environment, although he might legally have been a "prisoner" due to his parole status.[10] However, and most important, it is not in dispute that he was not placed in custody for *Miranda* purposes for violating parole, but rather so that the police could interrogate him about the robbery. In short, it is unclear the extent to which *Shatzer* and *Fields* apply outside the context of prison inmates

---

[7] See *id*. (describing the facts in *Edwards*).

[8] *Id*. at 113.

[9] *Ante* at 20.

[10] See *ante* at 20. The majority's citation to the parole statutes for the proposition that all parolees are "prisoners" under *Michigan* law does not justify incorporation of that very broad understanding of "prisoner" into the *Miranda* context. State statutes do not control the application of federal constitutional principles.

incarcerated on an unrelated charge and interviewed somewhere within the correctional facility that serves as their day-to-day home. But it is clear to me that here *Edwards*, and not *Fields*, controls.

Further, the custodial environment established during the initial police interview was not broken merely because it was a parole officer rather than a police officer who later questioned defendant about the same subject. First, the relationship between the questioner and the offender is not decisive. Second, Evans questioned defendant about the very crime for which he was previously questioned by the police officers and had invoked his Fifth Amendment right to counsel. Accordingly, defendant's prior assertion of his right to counsel was still in effect when Evans interviewed him in the jail library. Because he did not initiate that discussion, it was in violation of *Edwards*.

Some of the facts relied on by the majority to support its position, in fact, further illustrate why this case is governed by *Edwards* and not *Fields*. For example, the majority notes that, as in *Fields*, defendant here was not free to leave the jail library by himself and roam free. But the significance of that fact in *Fields* was to demonstrate that the defendant's freedom of movement was curtailed *all the time* because he lived in a prison as a result of a prior conviction and sentence.[11] In other words, being unable to roam free was the defendant's normal life, which inherently made that restriction less

_____

[11] See *Fields*, 565 US at ___; 132 S Ct at 1194 ("Returning to his cell would merely have returned him to his usual environment. . . . 'Interrogated suspects who have previously been convicted of crime live in prison. When they are released back into the general prison population, they return to their accustomed surroundings and daily routine—they regain the degree of control they had over their lives prior to the interrogation.'"), quoting *Shatzer*, 559 US at 113.

5

coercive. By contrast, before his arrest and custodial interrogation by the police three days earlier, defendant's freedom of movement was not restricted by daily incarceration. While the facts of *Fields* may be similar on this point, their legal significance is not.[12]

## 2. EVEN UNDER *FIELDS*, CUSTODIAL INTERROGATION OCCURRED

Even assuming that the majority is correct that defendant's ongoing *Miranda*/*Edwards* status was irrelevant and the *Fields* framework is applicable here instead, and I firmly believe it is not, a comparison between the facts of this case and *Fields* demonstrates that defendant was subjected to custodial interrogation. As in *Fields*, defendant did not invite the interview with Evans or consent to it in advance and he was not advised that he was free to decline to speak with Evans. Unlike in *Fields*, however, defendant in this case was not told that he was free to leave. Notably, the *Fields* majority cited the fact that the defendant in that case was told he was free to leave as the "[m]ost important" factor in its determination that the defendant was not in custody.[13] The Court went to the trouble to repeat its emphasis on this factor as "especially" important at the end of its opinion.[14] Thus, I disagree with the majority that this fact is neither controlling nor particularly compelling here.

---

[12] This conclusion is further supported by the fact that in the typical *Miranda* analysis, the inability to leave the interview freely is considered a factor *supporting* a finding of custody for purposes of *Miranda*. See, e.g., *JDB v North Carolina*, ___ US ___, ___; 131 S Ct 2394, 2411; 180 L Ed 2d 310 (2011).

[13] *Fields*, 565 US at ___; 132 S Ct at 1193.

[14] *Id*. at ___; 132 S Ct at 1194 ("Taking into account all of the circumstances of the questioning—including especially the undisputed fact that respondent was told that he was free to end the questioning and to return to his cell—we hold that respondent was not in custody within the meaning of *Miranda*.").

6

The majority believes that defendant's parolee status itself is relevant to the freedom of movement inquiry because it makes him more familiar with law enforcement and the type of environment in which he was interviewed. However, given that *Miranda* requires an analysis of whether "in light of 'the *objective* circumstances of the interrogation,' a 'reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave,'"[15] defendant's *subjective* beliefs about his freedom of movement are irrelevant. As the United States Supreme Court has held, "a suspect's prior interrogation history with law enforcement has no role to play in the custody analysis because such experience could just as easily lead a reasonable person to feel free to walk away as to feel compelled to stay in place."[16] I see no distinction between a defendant's prior history with law enforcement and his parolee status. A parolee is a parolee *because of* his or her prior history with law enforcement. That "inquiry turns too

---

[15] *Fields*, 565 US at ___; 132 S Ct at 1189 (emphasis added; citation omitted; alteration in original).

[16] *JDB*, ___ US at ___; 131 S Ct at 2404 ("Because the effect in any given case would be 'contingent [on the] psycholog[y]' of the individual suspect, the Court explained, such experience cannot be considered without compromising the objective nature of the custody analysis."), quoting *Yarborough v Alvarado*, 541 US 652, 668; 124 S Ct 2140; 158 L Ed 2d 938 (2004); see also *Alvarado*, 541 US at 666-667 (stating that "[o]ur opinions applying the *Miranda* custody test have not mentioned the suspect's age, much less mandated its consideration. *The only indications in the Court's opinions relevant to a suspect's experience with law enforcement have rejected reliance on such factors*," and that "[t]here is an important conceptual difference between the *Miranda* custody test and the line of cases from other contexts considering age and experience. The *Miranda* custody inquiry is an objective test") (emphasis added).

much on the suspect's subjective state of mind and not enough on the 'objective circumstances of the interrogation.'"[17]

Also in critical contrast to *Fields*, when defendant was questioned by Evans, he indisputably had asserted his Fifth Amendment right to counsel. Fields, who had been incarcerated for some time for some other unrelated offense and presumably had become acclimated with his incarceration, was not previously questioned about the subject of his interrogation, nor had he therefore previously asserted his Fifth Amendment right to counsel. Irrespective of the reason for defendant's initial arrest, defendant here had been continually incarcerated during the three days after the police had questioned him and he had invoked his right to counsel. The effect of this difference is hard to underestimate.

Because a reasonable person faced with these objective circumstances would not have felt at liberty to terminate the interrogation and leave, the first part of the *Miranda* inquiry is satisfied. I also conclude that Evans's interview with defendant presented the "same inherently coercive pressures as the type of station house questioning at issue in *Miranda*"[18] even if it is considered as a discrete event distinct from defendant's initial

---

[17] *Alvarado*, 541 US at 669 (citation omitted). The majority supports its reliance on the relevance of defendant's parolee status by citing to *Fields* and its discussion of whether the interrogator has "official power" over the defendant. See *ante* at 16 n 9. This is wrong for two reasons. First, that quote appears nowhere in the *Fields* discussion of the freedom-of-movement inquiry; rather, it is mentioned in the discussion of whether "imprisonment alone," i.e., *when the deprivation of freedom of movement is already established*, is sufficient to create a custodial situation within the meaning of *Miranda*. Second, the quotation only establishes that the questioner's power over the *defendant* is relevant. It does not make relevant whether a reasonable parolee would know that his parole officer "has no control over the jail, its staff, or the individuals incarcerated there."

[18] *Fields*, 565 US at ___; 132 S Ct at 1190.

custodial interrogation. Defendant was summoned to the jail library and was given no indication that he could decline to attend or leave the interview at any time. He was interviewed about the basis for his parole violations by Evans, the person serving as his parole officer for purposes of their meeting and with whom defendant had a prior relationship.[19] Perhaps most importantly, defendant had already been advised that he had a right to counsel before answering questions about the robbery, had taken that invitation up and requested counsel, but had not yet been provided counsel when he found himself questioned again about the same subject. Finally, Evans plainly had "authority to affect the duration of his sentence,"[20] as she was present at the jail to serve parole violation charges on defendant that could undoubtedly affect the amount of time defendant spent incarcerated.[21] Under these circumstances, the interview subjected defendant to inherently coercive pressures for purposes of *Miranda*. Accordingly, Evans's interview

---

[19] The majority attaches great significance to the fact that Evans was not defendant's regular parole officer. However, it is significant that Evans testified that she had supervised defendant in the past, that she "couldn't even count the number of times" she had been in contact with him, and that she and defendant "have respect for each other for the way he's dealt with us in the past and the way that I've dealt with him." Thus, the majority's assertion that no "unique relationship" existed between the two of them is, at the very least, open to debate. Moreover, that Evans was not defendant's regular parole officer did not remove or dilute her power over him given that she was plainly a state actor responsible for overseeing his parole violation case at the time of the interview.

[20] *Id*. at ___; 132 S Ct at 1191.

[21] Indeed, had defendant not been convicted of the armed robbery, the parole violations may have been *dispositive* of how much time defendant served, and Evans's influence would have been critical. Additionally, at the time of Evans's interview, the parole violations had not been adjudicated; she was there to serve defendant with the violation charges. What penalty would result from the charges was still unknown to defendant during this interview.

9

with defendant constituted its own custodial interrogation even under the *Fields* framework on which the majority relies.

Estelle v Smith is also instructive in determining whether Evans's interview with defendant constituted its own custodial interrogation.[22] In that case, a psychiatrist interviewed the defendant in jail to evaluate the defendant's competency to stand trial. The United States Supreme Court held that the state could not introduce the defendant's statements or the psychiatrist's conclusions, which were based on those statements. The Court noted that "[t]he considerations calling for the accused to be warned prior to custodial interrogation apply with no less force to the pretrial psychiatric examination at issue here."[23] The *Estelle* Court further observed that the defendant was in custody when the examination was conducted, and noted that the fact that he was questioned by a psychiatrist designated by the trial court to conduct a neutral competency examination, rather than by a police officer, government informant, or prosecuting attorney, was "immaterial."[24] The crucial inquiry, rather, was the role the psychiatrist played at the defendant's trial, which included testifying for the prosecution on the crucial issue of

---

[22] *Estelle v Smith*, 451 US 454; 101 S Ct 1866; 68 L Ed 2d 359 (1981). I articulate my argument in this manner because as explained in part I(B)(1) of my opinion, my primary contention is that the custodial environment established at the initial police interview never ceased, so *Edwards* controls.

[23] *Id*. at 467. The majority contends that *Estelle* is irrelevant to the custody issue because the Court simply assumed the defendant in *Estelle* was in custody for *Miranda* purposes because he was in jail. I disagree. In fact, the *Estelle* Court analyzed whether the psychiatric examination involved a coercive environment. Thus, it is instructive with regard to the custody issue.

[24] *Id*.

10

respondent's future dangerousness. In providing that testimony, the Court ruled, "his role changed and became essentially like that of an agent of the State recounting unwarned statements made in a postarrest custodial setting."[25]

It is not disputed that defendant was in physical custody when Evans conducted the interview, that his interrogation was related to the robbery, or that he had previously asserted his Fifth Amendment right to counsel when questioned by police about the same subject. The role Evans played at the time of the interview is "immaterial" per *Estelle*.[26] The significant issue about Evans's role is the one she played at defendant's trial when she was directly adversarial to defendant; she testified that he made statements admitting to the robbery at issue, which were presented as substantive evidence of defendant's guilt, and the prosecution referred to her as "probably the most crucial" witness. Just like in *Estelle*, regardless of her previous role in collecting defendant's statement in the first place, by providing such testimony, Evans's "role changed and became essentially like that of an agent of the State" recounting statements obtained in violation of *Edwards*.[27]

## II. WAIVER

The Chief Justice joins the majority's result on the basis that defendant waived his Fifth Amendment right to counsel by initiating further communication with the police. I respectfully disagree with his waiver argument for three reasons. First, I do not believe

---

[25] *Id*.

[26] This fact renders inapt the prosecution's attempt to analogize the parole officer/parolee relationship *generally* to the social worker/client relationship.

[27] *Id*.

11

and I know of no authority to support, the proposition that *Miranda* can be circumvented by an ex post facto waiver analysis when defendant, having asserted his right to counsel, did not in fact initiate the subsequent conversation in which the incriminating statements were made.[28] It is undisputed that defendant did not initiate the interview with Evans. Second, the prosecution never made a waiver argument, in this Court or in the lower courts. Third, defendant's alleged letter appears nowhere in the record and there is no evidence the police ever actually received it, so I would not rely solely on Evans's testimony about defendant's statement about sending a letter in order to find waiver here.

### III. CONCLUSION

I respectfully dissent from the majority's decision to reverse the judgment of the Court of Appeals. I would hold that the custodial environment established during defendant's initial police interview as well as his invocation of his right to counsel remained in effect at the time Evans interviewed him. Because defendant did not initiate the interview with Evans, the admission of Evans's testimony regarding defendant's statements to her violated *Edwards*. Alternatively, I would hold that Evans's questioning

---

[28] See *Miranda*, 384 US at 479 ("[The defendant] must be warned *prior to any questioning* that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. *But unless and until such warnings and waiver are demonstrated by the prosecution at trial*, no evidence obtained as a result of interrogation can be used against [the defendant].") (emphasis added); see also *Shatzer*, 559 US at 111 n 7 ("*Edwards* establishes a *presumption* that a suspect's waiver of *Miranda* rights is involuntary.").

12

of defendant constituted its own custodial interrogation for *Miranda* purposes.  The Court of Appeals correctly concluded that defendant's statements to Evans were inadmissible and should have been suppressed.[29]  Accordingly, I would affirm the judgment of the Court of Appeals remanding this case for a new trial.

Bridget M. McCormack
Michael F. Cavanagh

---

[29] Although the prosecution has not argued that the admission was harmless in this Court, I agree with the Court of Appeals that the admission of defendant's statements to Evans was not harmless for the reasons stated in the Court of Appeals opinion.